UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:16-CV-81942-ROSENBERG/BRANNON

COMPULIFE SOFTWARE, INC.,

    Plaintiff,

v.

MOSES NEWMAN *et al.*,

    Defendants.

_____/

## MEMORANDUM OPINION AND ORDER

**THIS CAUSE** is before the Court on the Motion for Preliminary Injunction and Memorandum of Law in Support [DE 5][1] filed by Plaintiff, Compulife Software, Inc. ("Compulife"). The Court has carefully reviewed Compulife's Motion and all pertinent portions of the record. In addition, the Court held an evidentiary hearing on March 30 and 31, 2017, and is otherwise fully advised in the premises. The Court now issues this Memorandum Opinion and Order setting forth its findings of fact and conclusions of law. For the reasons set forth below, Compulife's Motion is **DENIED**.

### I.     INTRODUCTION

This is an action for misappropriation of trade secrets and copyright infringement. *See* DE 1; DE 24.[2] In the Motion presently before the Court, Compulife—a software company whose products allow insurance agents and consumers to obtain quotes for term life insurance—seeks

---

[1] The same filing also contained an *Ex Parte* Application for Entry of Temporary Restraining Order and a Motion for Civil Seizure Order, both of which were denied on December 8, 2016. *See* DE 15.
[2] Compulife's Verified Complaint also contains a number of additional claims not relevant at this stage of the proceedings. *See* DE 1; DE 24.

preliminary injunctive relief to prevent further misappropriation and infringement. *See* DE 31.[3] Having failed to establish that it will suffer irreparable injury unless the injunction issues, Compulife is not entitled to preliminary injunctive relief.

## II. FINDINGS OF FACT

The Court finds that the following facts have been established by a preponderance of the evidence.

### A. Compulife and Term4Sale

Robert Barney is the president and majority shareholder of Compulife. DE 70 ¶ 1; Hrg. Tr. Vol. 1 at 17:13–14. Compulife is the creator and manufacturer of the Compulife Quotation System, a software program that allows individuals to compare term life insurance products and rates. DE 70 ¶¶ 3–4; Hrg. Tr. Vol. 1 at 17:15–18. Compulife itself does not sell insurance. DE 70 ¶ 4; Hrg. Tr. Vol. 1 at 17:19–20.

Compulife's software includes both host-based software residing on a server and web-based software consisting of HTML code. Hrg. Tr. Vol. 1 at 17:21–18:13. The web-based HTML code allows an individual to visit a website and enter certain information—such as age, sex, and amount of insurance desired—in order to request life insurance quotes. Hrg. Tr. Vol. 1 at 18:4–25. The HTML code then submits that request to the host-based software, which looks up the rates and product information for various insurance companies, calculates premiums, and produces quotes that are ultimately displayed on the website. Hrg. Tr. Vol. 1 at 18:4–19:8.

The purpose of the HTML code is to communicate with the host-based software. Hrg. Tr. Vol. 1 at 27:2–6. To that end, the HTML code contains specific variable names and variable values created by Compulife, which are necessary to communicate effectively with the host-

---

[3] Because certain pages are missing from the document filed at DE 5, a complete copy of Compulife's Motion was filed at DE 31.

based software in order to generate quotes. Hrg. Tr. Vol. 1 at 20:23–22:13; Hrg. Tr. Vol. 2 at 43:13–44:5.

The server on which the host-based software resides also houses Compulife's database of digital information about the term life insurance market, products, and rates. Hrg. Tr. Vol. 1 at 27:7–17, 28:4–25. Compulife obtains this information, including rate tables, from insurance companies, but does not own this information. Hrg. Tr. Vol. 1 at 74:2–9. This information is public and is provided to other companies offering software that competes with Compulife's. Hrg. Tr. Vol. 1 at 74:5–11; Hrg. Tr. Vol. 2 at 6:13–18.

However, Compulife enters this information into its software using confidential and proprietary technology. Hrg. Tr. Vol. 1 at 28:4–9. Compulife compiles this information into a database in a confidential manner and encrypts the database to prevent reverse engineering. Hrg. Tr. Vol. 1 at 28:17–25; Hrg. Tr. Vol. 2 at 44:6–45:13. For that reason, Compulife considers the way it stores its information to be a trade secret. Hrg. Tr. Vol. 1 at 74:2–5. The host-based software calculates premiums and generates quotes by accessing this database of information residing on the server. Hrg. Tr. Vol. 1 at 27:7–13, 30:11–31:4. Mr. Barney believes that Compulife's quotes are unique due to the manner in which Compulife stores this information and the procedures Compulife uses to calculate premiums. Hrg. Tr. Vol. 2 at 6:19–21.

When an insurance company changes its rates, Compulife updates the rate tables and other information within its database. Hrg. Tr. Vol. 1 at 28:13–16, 31:5–19. This information is constantly updated to reflect changes in the term life insurance market. Hrg. Tr. Vol. 1 at 40:8–13, 75:21–24. If information is not timely updated, or if Compulife produces an inaccurate quote for any other reason, Compulife's customers—most of whom are insurance agents who use

Compulife's products daily to generate quotes for individual consumers—immediately contact Compulife to complain. Hrg. Tr. Vol. 1 at 76:7–24; Hrg. Tr. Vol. 2 at 7:23–8:8.

Compulife has registered its software with the United States Copyright Office. DE 70 ¶ 10; DE 70-1; Hrg. Ex. 79. Compulife's "2010 HTML Source Code" was registered on May 29, 2015 and assigned registration number TX 8-106-364. DE 70 ¶ 10; Hrg. Tr. Vol. 2 at 42:3–10; Hrg. Ex. 2; Hrg. Ex. 79.

In addition to licensing its software, Compulife maintains a website at www.term4sale.com ("Term4Sale"). Hrg. Tr. Vol. 1 at 19:9–14. Term4Sale is a public website that allows visitors to obtain life insurance quotes at no cost. Hrg. Tr. Vol. 1 at 19:14–15. Term4Sale also provides visitors with a list of insurance agents, all of whom are Compulife customers, to contact if the visitors are interested in purchasing life insurance. Hrg. Tr. Vol. 1 at 19:16–20. Term4Sale generates life insurance quotes using Compulife's web-based HTML code, host-based software, and database of information in the manner described above. Hrg. Tr. Vol. 1 at 19:11–14.

Compulife competes with several companies that offer life insurance quotes online, including Ninja Quote (which joined the market in 2016) and Nerd Wallet. Hrg. Tr. Vol. 1 at 74:12–75:7. Like Compulife, these companies obtain rate tables from life insurance companies and use them to calculate premiums that appear on their websites. Hrg. Tr. Vol. 1 at 75:8–20.

## B. NAAIP and BeyondQuotes

The National Association of Accredited Insurance Professionals ("NAAIP") maintains a website at www.naaip.org. DE 70 ¶ 20; Hrg. Tr. Vol. 1 at 32:8–24. NAAIP offers free websites to life insurance agents. DE 70 ¶ 21. One feature of these websites is NAAIP's "Life Insurance Quote Engine." Likewise, the website www.beyondquotes.com ("BeyondQuotes") offers the

Life Insurance Quote Engine. DE 70 ¶ 63. With the Life Insurance Quote Engine, both the NAAIP websites and BeyondQuotes—like Term4Sale—allow visitors to enter certain basic personal information and obtain a list of quotes for term life insurance policies. DE 70 ¶ 64.

Compulife maintains that Defendants Moses Newman, Aaron Levy, David Rutstein, and Binyomin Rutstein control or contribute to the operation of both NAAIP and BeyondQuotes. Because it is not necessary to the disposition of this Motion, the Court makes no determination as to Defendants' involvement with NAAIP and BeyondQuotes.

On April 8, 2015, Mr. Barney discovered that NAAIP and BeyondQuotes had copied Compulife's HTML code onto their websites and had accessed Compulife's database of information. Hrg. Tr. Vol. 1 at 32:8–35:13; Hrg. Ex. 70; Hrg. Ex. 71; Hrg. Ex. 73. None of the Defendants, NAAIP, or BeyondQuotes has ever had Compulife's permission or authority to access Compulife's database of information or copy Compulife's HTML code. DE 70 ¶¶ 60–62; Hrg. Tr. Vol. 1 at 38:9–11. After learning that NAAIP and BeyondQuotes had accessed Compulife's software and database by using a Compulife customer's account, Mr. Barney disabled access, and both the NAAIP and BeyondQuotes websites ceased producing life insurance quotes by April 10, 2015. Hrg. Tr. Vol. 1 at 32:25–33:10, 35:16–39:11; Hrg. Ex. 13; Hrg. Ex. 14. Shortly thereafter, Mr. Barney sent an email to David Rutstein demanding that he remove Compulife's HTML code from his websites. Hrg. Tr. Vol. 1 at 38:18–39:1.

Between May and June of 2015, NAAIP and BeyondQuotes were again able to produce quotes through an arrangement with one of Compulife's competitors. Hrg. Tr. Vol. 1 at 39:12–17. That arrangement was terminated and both websites again ceased producing life insurance quotes in mid-June. Hrg. Tr. Vol. 1 at 39:18–40:3. A few weeks later, the websites began producing quotes again using Compulife's software and database of information. Hrg. Tr. Vol. 1

at 40:4–7. Monitoring these websites, Mr. Barney observed that every two or three months between July 2015 and September 2016, the information on these websites would become stale, then updated information would suddenly appear. Hrg. Tr. Vol. 1 at 40:14–24.

During this time, on May 23, 2016, Compulife filed suit against David Rutstein and Binyomin Rutstein. *See* Case No. 9:16-cv-80808-RLR, DE 1. Compulife's Amended Complaint, filed in that case on May 26, 2016, includes claims for direct copyright infringement, contributory copyright infringement, federal unfair competition, federal theft of trade secrets, Florida theft of trade secrets, violation of the Florida Computer Abuse and Data Recovery Act, Florida common law unfair competition, and violation of the Florida Deceptive and Unfair Trade Practices Act, all stemming from NAAIP's alleged actions with respect to Compulife's software and database of information. *See* Case No. 9:16-cv-80808-RLR, DE 8. Compulife did not seek preliminary injunctive relief in that case. Due to substantial overlap in the factual allegations and claims asserted, that case and the instant case have been consolidated for trial. *See* DE 44.

## C. Get Commands and Scraping

Between September 1 and September 4, 2016, a server located in Israel sent over 800,000 get commands to the host-based software on the Term4Sale server. Hrg. Tr. Vol. 1 at 41:18–21, 43:10–16; Hrg. Ex. 26; Hrg. Ex. 78. At the time, both the NAAIP and BeyondQuotes websites were hosted on a single server in Israel. DE 9 ¶¶ 7–8; Hrg. Tr. Vol. 1 at 46:20–47:1, 48:19–22. A get command is an alternative way to communicate with the host-based software without going through a website. Hrg. Tr. Vol. 1 at 60:2–7. In order to produce the get commands, portions of Compulife's HTML code were required—specifically, the correct names for variables such as the amount of insurance requested—without which the get commands would not have provided accurate results. Hrg. Tr. Vol. 1 at 60:8–61:8, 69:8–20; Hrg. Tr. Vol. 2 at 43:13–44:5; Hrg. Ex.

6

26. Each get command was for an individual customer scenario and resulted in the production of multiple quotes, typically for 50 different insurance companies. Hrg. Tr. Vol. 1 at 50:25–51:7. As a result, the Term4Sale server produced approximately 43,500,000 insurance quotes in response to the get commands. Hrg. Tr. Vol. 1 at 51:8–13; Hrg. Ex. 26; Hrg. Ex. 78.

These quotes produced by the Term4Sale server were then "scraped" and inserted into a database in order to produce insurance quotes on the NAAIP and BeyondQuotes websites. Hrg. Tr. Vol. 1 at 51:16–52:7; Hrg. Ex. 26. Prior to September 1, 2016, Compulife had added a digital watermark to its database that serves to identify the source of information produced by Compulife software. Hrg. Tr. Vol. 1 at 41:4–14. Compulife's digital watermark appears in quotes generated on the NAAIP and BeyondQuotes websites since September 2016. Hrg. Ex. 26.

Mr. Barney learned of the scraping within a week after it occurred, when he recognized a particular watermark on one of the NAAIP websites. Hrg. Tr. Vol. 2 at 47:6–13. Mr. Barney's investigation into what had occurred was complete within the week. Hrg. Tr. Vol. 2 at 47:19–22. Compulife filed the Motion presently before the Court nearly three months later, on December 2, 2016. *See* DE 5.

The quotes that NAAIP and BeyondQuotes are currently producing on their websites using Compulife's scraped information are now out of date and inaccurate. Hrg. Tr. Vol. 1 at 63:6–67:22, 78:6–24. As of the end of March 2017, the NAAIP and BeyondQuotes websites were still producing quotes using information from September 2016, which is now outdated. Hrg. Tr. Vol. 1 at 63:6–63:24, 78:6–79:5. In addition, both websites appear to use information applicable to Florida in order to generate quotes for insurance in Montana, where rates differ significantly due to variations in applicable laws and regulations. Hrg. Tr. Vol. 1 at 64:2–67:22, 81:9–82:6.

Despite the events of September 2016, Compulife has not turned off the get command. Hrg. Tr. Vol. 1 at 68:23–24. Mr. Barney decided not to do so because it would be very simple for another programmer to get the same information another way. Hrg. Tr. Vol. 1 at 68:24–69:7. Instead, Mr. Barney has found alternative means to control access: since October 2016, Compulife has employed a degrade function in its software that prevents scraping. Hrg. Tr. Vol. 2 at 12:2–14:20. According to Mr. Barney, any further attempts at scraping would lead to "an unhappy result" with the degrade function that Compulife has now built into its engine. Hrg. Tr. Vol. 2 at 46:24–47:5. Indeed, Mr. Barney confidently testified that—while no one could exclude the possibility that a sophisticated, intelligent hacker might find another way to access Compulife's database—the degrade function had been implemented to "end it all," and he would "hate to be the person to try to unencrypt [Compulife's] encrypted data files." Hrg. Tr. Vol. 2 at 47:23–48:11. In addition, while the Term4Sale website did not include a user agreement at the time of the scraping, one was added shortly afterward. Hrg. Tr. Vol. 1 at 72:18–73:2; Hrg. Tr. Vol. 2 at 9:4–18.

Prior to September 1, 2016, no information had been scraped from the Term4Sale server. Hrg. Tr. Vol. 1 at 77:21–23. No additional attempts to scrape have been made since September 2016. Hrg. Tr. Vol. 1 at 77:24–78:1; Hrg. Tr. Vol. 2 at 46:16–47:5. The scraping in September 2016 is the only incident of its kind. Hrg. Tr. Vol. 1 at 78:2–3.

**D. Injury to Compulife**

While the scraping may have resulted in certain monetary damages, the extent of such damages is unclear. Mr. Barney testified, without substantiation, that Compulife has suffered "a variety of harm," including the cost of measures taken to stop further trade secret misappropriation and copyright infringement by Defendants, loss of new business, loss of

revenue stemming from payments for the use of Compulife's software, and lost traffic at the Term4Sale website. Hrg. Tr. Vol. 1 at 62:10–63:5. Mr. Barney also testified that each insurance agent using an NAAIP website is a potential Compulife customer—that is, a potential source of revenue (approximately $200 per year) from licensing Compulife software to that agent. Hrg. Tr. Vol. 2 at 35:21–36:17. In more general terms, Mr. Barney testified that Compulife's business—which "had been on a general track record upward"—has "gone downward." Hrg. Tr. Vol. 2 at 37:4–14. However, Mr. Barney could not testify to any impact on Compulife's sales as a result of the scraping. Hrg. Tr. Vol. 2 at 27:11–22. In addition, Mr. Barney testified that he "has not compiled" any ascertainable monetary damages suffered by Compulife as a result of the scraping. Hrg. Tr. Vol. 2 at 32:9–14.

More broadly, Mr. Barney was unable to identify any harm caused specifically by the scraping, as opposed to other alleged trade secret misappropriation and copyright infringement of which Mr. Barney has been aware since April 2015, which is the subject of Compulife's earlier case filed in May 2016 in which no preliminary injunction was sought. When asked what damage the scraping caused specifically, Mr. Barney answered: "I can't break it out as a separate entity. I am telling you it is all part and parcel of the damage that your client is causing to my company, and he intends—I have emails from your client where he threatens me to do damage." Hrg. Tr. Vol. 2 at 30:19–24.

Compulife has not lost any existing customers to NAAIP or BeyondQuotes as a result of the scraping. Mr. Barney testified in general terms that the scraping has resulted in a loss of new business. Hrg. Tr. Vol. 1 at 62:10–16. Mr. Barney also testified that each insurance agent using an NAAIP website is a potential Compulife customer. Hrg. Tr. Vol. 2 at 35:21–36:17. However,

Mr. Barney testified that he was not aware of any existing customers who left Compulife for an NAAIP website as a result of the scraping. Hrg. Tr. Vol. 2 at 19:11–18, 27:11–14, 32:15–17.

It is unclear whether and to what extent Compulife has suffered harm to its reputation as a result of the scraping. Mr. Barney testified broadly, without any substantiation, that Compulife has suffered irreparable harm to its reputation due to the mere "existence of the conflict." Hrg. Tr. Vol. 2 at 27:20–28:2. To the extent that Compulife may indeed have suffered such harm, an assertion of which the Court is not persuaded, Mr. Barney himself has certainly contributed to it. For example, Mr. Barney contacted about 450 insurance agents using NAAIP websites regarding Defendants' alleged copyright infringement. Hrg. Tr. Vol. 2 at 28:13–30:1. In addition, Mr. Barney created and maintains a website at www.davidrutstein.com that describes the alleged copyright infringement and other details about "the conflict." Hrg. Tr. Vol. 1 at 79:19–80:13; Hrg. Tr. Vol. 2 at 28:3–30:17.

### III. CONCLUSIONS OF LAW

Based on the findings of fact set forth above, the Court makes the following conclusions of law.

To obtain a preliminary injunction, Compulife must establish that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to Compulife outweighs whatever damage the proposed injunction may cause Defendants; and (4) if issued, the injunction would not be adverse to the public interest. *See Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citing *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)). "In this Circuit, '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly

establishe[s] the "burden of persuasion"' as to each of the four prerequisites." *Id.* (quoting *McDonald's*, 147 F.3d at 1306).

In the Motion presently before the Court, Compulife seeks an injunction requiring Defendants to (1) cease the use of Compulife's scraped trade secret information; (2) cease any further attempts to scrape Compulife's information; and (3) take affirmative action to segregate the information and any documents indicating how it was obtained, preserve that information, disclose it to Compulife, and not destroy it during the pendency of this case. Hrg. Tr. Vol. 2 at 48:15–50:10. Compulife identifies its trade secret information as the database or "compilation of digital information contained within the Compulife Software concerning the term life insurance market, term life products and term life rates," which does not include Compulife's software, but does include the quotes scraped from the Term4Sale server. Hrg. Tr. Vol. 2 at 57:4–59:8; DE 31 at 10.

**A. Substantial Likelihood of Success on the Merits**

As the Court has already noted, not all of the claims asserted in Compulife's Verified Complaint are relevant at this stage of the proceedings. Rather, in the Motion presently before the Court, Compulife asserts only that Defendants have violated (1) the Economic Espionage Act of 1996 as amended by the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(b), and (2) the Copyright Act, 17 U.S.C. § 501. *See* DE 31 at 18. Thus, at most, only Compulife's claims for misappropriation of trade secrets and copyright infringement are relevant here. However, Compulife's Motion fails to present any legal argument for the likelihood of success on the merits of its copyright infringement claim. *See* DE 30 at 20–21 (presenting legal argument for likelihood of success on the merits of trade secrets claim only); Hrg. Tr. Vol. 2 at 50:11–57:2. In addition, in its written submissions, Compulife failed to dispute Defendants' assertion that

Compulife's Motion is limited to Defendants' alleged scraping of trade secrets. *See* DE 46 at 1–2; DE 60; DE 62 at 2; DE 66; Hrg. Tr. Vol. 2 at 50:11–57:2. During the hearing on Compulife's Motion, Compulife argued that copyright violation is a necessary part of the scraping of trade secrets, as the scraping required the use of portions of Compulife's copyrighted HTML code. *Id.* Nevertheless, the Court is not persuaded that the likelihood of success on the merits of Compulife's copyright infringement claim is at issue for purposes of the Motion presently before the Court.

Whether or not Compulife has properly asserted a substantial likelihood of success on the merits of its copyright infringement claim in addition to its misappropriation of trade secrets claim, the Court need not determine whether Compulife has in fact established a substantial likelihood of success on the merits of either claim. As discussed in greater detail below, Compulife has failed to establish that it will suffer irreparable injury unless the injunction issues. Accordingly, Compulife is not entitled to preliminary injunctive relief.

## B. Irreparable Injury

"A showing of irreparable injury is the *sine qua non* of injunctive relief." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (internal quotations marks omitted). Thus, "even if [Compulife] establish[es] a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Id.* While Compulife argues otherwise, establishing a substantial likelihood of success of the merits of its copyright infringement claim would not entitle Compulife to a presumption of irreparable injury. Rather, Compulife would still be required to demonstrate that it will suffer irreparable injury unless the injunction issues. *See Peter Letterese & Assocs., Inc. v. World Inst. Of Scientology Enters.*, 533 F.3d 1287, 1323 (11th Cir. 2008) (citing *eBay Inc. v.*

*MercExchange, L.L.C.*, 547 U.S. 388, 391–92 (2006)); *Hoop Culture, Inc. v. GAP Inc.*, 648 F. App'x 981, 984–85 (11th Cir. 2016); *Bollea v. Gawker Media, LLC*, 913 F. Supp. 2d 1325, 1331 (M.D. Fla. 2012); *Home Legend, LLC v. Mannington Mills, Inc.*, No. 4:12-CV-237-HLM, 2013 WL 12086791, at *14 (N.D. Ga. Apr. 11, 2013). Likewise, Compulife has not cited, and the Court has not found, any legal authority for the proposition that Compulife would be entitled to a presumption of irreparable injury upon establishing a likelihood of success on the merits of its misappropriation of trade secrets claim. *Cf., e.g.*, *Primo Broodstock, Inc. v. Am. Mariculture, Inc.*, No. 2:17-CV-9-FTM-29CM, 2017 WL 1502714, at *11 (M.D. Fla. Apr. 27, 2017) (concluding that plaintiff had failed to establish irreparable harm, and denying injunctive relief for that reason, regardless of whether there had been any misappropriation of trade secrets); 18 U.S.C. § 1836 (containing no indication that a plaintiff is entitled to presumption of irreparable injury). Even if Compulife is entitled to a presumption of irreparable injury, the evidence before the Court is sufficient to rebut such a presumption.

"To demonstrate irreparable harm, a movant must show 'that the injury cannot be undone through monetary remedies.' The irreparable injury claimed 'must be neither remote nor speculative, but actual and imminent.'" *Telestrata, LLC v. NetTALK.com, Inc.*, 126 F. Supp. 3d 1344, 1353 (S.D. Fla. 2015) (quoting *Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1223 (S.D. Fla. 2014)). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (internal quotation marks and citation omitted). To the extent that Compulife has presented evidence of such injuries as the cost of measures taken to stop further trade secret misappropriation and copyright infringement by Defendants, loss of new business, loss of revenue stemming from payments for

the use of Compulife's software, lost traffic at the Term4 Sale website, and a general downturn in business, such injuries may be undone through monetary remedies and are therefore not irreparable.

"[T]he loss of customers and goodwill is an 'irreparable' injury." *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (citing *Spiegel v. City of Houston*, 636 F.2d 997 (5th Cir. 1981)); *see also Arthur J. Gallagher Serv. Co. v. Egan*, 514 F. App'x 839, 843 (11th Cir. 2013) (citing *Ferrero*, 923 F.2d at 1449) ("The loss of longstanding clients and goodwill is an irreparable injury."). However, Compulife has presented no evidence that a single existing customer has been lost to NAAIP or BeyondQuotes. Instead, Compulife has presented evidence that it has lost *new* business, and that each insurance agent using an NAAIP website is a *potential* Compulife customer—that is, a potential source of revenue (approximately $200 per year) from licensing Compulife software to that agent. Such injury, again, may be undone through monetary remedies. To the extent that there has been any injury to Compulife's goodwill or reputation, the only evidence of which is Mr. Barney's vague, unsubstantiated testimony, Mr. Barney has certainly contributed to it himself through the content he publishes on www.davidrutstein.com and his contact with NAAIP agents. *See Mercedes-Benz U.S. Int'l, Inc. v. Cobasys, LLC*, 605 F. Supp. 2d 1189, 1207 (N.D. Ala. 2009) (citing *BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005)) (requiring more specific showing of loss of goodwill and reputation than self-serving testimony of party seeking injunction).

Furthermore, based on Mr. Barney's testimony that his customers are very attuned and responsive to inaccurate quotes, and his testimony that the quotes produced on the NAAIP and BeyondQuotes websites are inaccurate and outdated, the Court finds it unlikely that any existing

customers will leave Compulife—whose quotes Mr. Barney testified are generally accurate—for either NAAIP or BeyondQuotes. Indeed, in light of Mr. Barney's testimony, the scraped information was likely stale and producing inaccurate quotes by the time Compulife filed the Motion presently before the Court. The continued use of scraped information therefore will not result in irreparable injury.

"A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). Mr. Barney discovered the scraping and concluded his investigation within one or two weeks of its occurrence, but waited nearly three months before seeking a preliminary injunction. In addition, Mr. Barney has been aware of certain alleged misappropriation of trade secrets and copyright infringement by NAAIP and BeyondQuotes since April 2015, as a result of which Mr. Barney filed suit against David Rutstein and Binyomin Rutstein in May 2016. Compulife did not, however, seek a preliminary injunction in that case. Importantly, Compulife has been unable to establish the extent to which any of its injuries are tied to the September 2016 scraping rather than the actions of which Mr. Barney has been aware since April 2015.

It is unlikely that further scraping or similar activity will occur in the immediate future. Compulife presented no evidence that any attempts at scraping occurred before or since September 2016; rather, the scraping in September 2016 was the only incident of its kind. Similarly, there is no evidence of any specific threat of another type of invasion. Finally, Mr. Barney testified that it would be very difficult for anyone to scrape or otherwise obtain Compulife's information going forward due to the measures he has taken since September 2016.

For all of these reasons, the Court concludes that Compulife will not suffer irreparable injury in the absence of an injunction.

**C. Balance of Harms and Public Interest**

Because it has failed to establish that irreparable injury will be suffered unless the injunction issues, Compulife is not entitled to preliminary injunctive relief. *See Siegel*, 234 F.3d at 1176. Accordingly, the Court need not consider whether the threatened injury to Compulife outweighs whatever damage the proposed injunction may cause Defendants, or whether the injunction would be adverse to the public interest.

### IV. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Plaintiff's Motion for Preliminary Injunction [DE 5] is **DENIED**.

**DONE AND ORDERED** in Chambers, Fort Pierce, Florida, this 12th day of June, 2017.

Copies furnished to:  
Counsel of record

ROBIN L. ROSENBERG  
UNITED STATES DISTRICT JUDGE