UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

COMPULIFE SOFTWARE, INC.

                Plaintiff,

v.                                     CASE NO: 9:16-CV-80808-REINHART

BINYOMIN RUTSTEIN a/k/a BEN
RUTSTEIN, DAVID RUTSTEIN a/k/a
DAVID GORDON a/k/a BOB GORDON
a/k/a NATE GOLDEN and JOHN DOES 1
TO 10,

                Defendants.
_____

COMPULIFE SOFTWARE INC.,

                Plaintiff,

v.                                     CASE NO.: 9:16-CV-81942-REINHART

MOSES NEWMAN, DAVID RUTSTEIN,
BINYOMIN RUTSTEIN AND AARON
LEVY,
                Defendants.
_____

## **ORDER**

      Plaintiff Compulife Software, Inc. ("Compulife") and the Defendants are direct competitors in the business of generating life insurance quotes on the internet. These two lawsuits stem from Defendants' alleged theft of Compulife's intellectual property. These matters are before me upon the Eleventh Circuit's reversal of the judgment entered in Defendants' favor following an October 2017 bench trial of these matters before a different magistrate judge. *See Compulife*

*Software Inc. v. Newman*, 959 F.3d 1288 (11th Cir. 2020).[1]  According to the Eleventh Circuit's remand order, the claims that remain for adjudication are as follows:

      • in the '08 case, Counts I and II of the Amended Complaint, which allege copyright infringement, and Counts IV and V, which allege theft of trade secrets.  *See* Case No. 16-cv-80808-BER (ECF No. 8); and

      • in the '42 case, Counts I and V of the Complaint, which allege theft of trade secrets, and Counts II and III, which allege copyright infringement.  *See* Case No. 16-cv-81942-BER (ECF No. 24).

      Specifically, in the '08 case, Compulife alleges that Defendants infringed on its copyright in the HTML source code of its life insurance "web quoter" when Defendants implemented similar quoters on their own websites.[2]  Compulife also alleges that Defendants misappropriated its trade secret by accessing its Transformative Database on another server to generate life insurance quotes without Compulife's permission.  *See* Case No. 16-cv-80808-BER (ECF No. 8).[3]

---

[1] On July 6, 2020, the parties consented to have me preside over the final disposition of these matters. Case No. 16-cv-80808-BER (ECF Nos. 266, 267); Case No. 16-cv-81942-BER (ECF Nos. 277, 278).  All citations in this decision are to the filings in the '08 case.

[2] A "web quoter" is used as a marketing tool to attract customers: once a website is equipped with a web quoter, prospective life-insurance purchasers can enter demographic information into fields on the site and receive insurance rate quotes directly. . . the web quoter generates quotes by communicating with an internet-quote engine hosted on Compulife's server.  *Compulife Software Inc.*, 959 F.3d at 1296. The HTML source code of the web quoter is protected by a registered copyright.  *Id.*

[3] Compulife maintains a database of insurance-premium information—called the "Transformative Database"—to which it sells access. *Compulife Software Inc.*, 959 F.3d at 1296. The Transformative Database is valuable because it contains up-to-date information on many life insurers' premium-rate tables and thus allows for simultaneous comparison of rates from dozens of providers.  *Id.*  Most of Compulife's customers are insurance agents who buy access to the database so that they can more easily provide reliable cost estimates to prospective policy purchasers.  *Id.*

In the '42 case, Compulife alleges that Defendants (1) infringed on its copyright by copying parameters and variables from its HTML source code in order to carry out a "scraping attack" and (2) misappropriated a trade secret by scraping data from its Term4Sale site.  *See* Case No. 16-cv-81942-BER (ECF No. 24).[4]

I conducted a non-jury trial of these matters from November 16, 2020 through November 20, 2020.  I heard counsel's closing arguments on December 17, 2020.  On January 19, 2021, counsel submitted their Proposed Findings of Fact and Conclusions of Law.  ECF Nos. 306, 307.[5] Pursuant to Federal Rule of Civil Procedure 52(a)(1), I hereby enter my findings of fact and conclusions of law.

## <u>FINDINGS OF FACT</u>

<u>Compulife's Business Operations</u>

1. Compulife develops and markets life insurance comparison and quotation software. (Vol. 1, 39:5-6).[6]

2. Robert Barney founded the company in 1982 and is its president. (Vol. 1, 38:24-39:3, 41:4; Vol. 2, 16:4-5). Chris Bruner is Compulife's programmer. (Vol 2, 119:5-7). Jeremiah

---

As the Eleventh Circuit noted, "[Mr.] Barney personally updates Compulife's Transformative Database. To do so, he draws on insurers' publicly available rate information, but he also employs a proprietary calculation technique—in particular, a secure program to which only he has access and that only he knows how to use." *Compulife Software Inc.*, 959 F.3d at 1298.

[4] "Scraping" is a technique whereby a hacker extracts large amounts of data from a website. *Id.* at 1299.

[5] The identical Proposed Findings of Fact and Conclusions of Law were also filed in the '42 case. ECF No. 308, 309.

[6] References to Volumes 1-5 correspond to the transcripts filed in the '08 case from each day of the five-day trial.  ECF No. 308-312.

Kuhn is in charge of customer and technical support and is Compulife's chief financial officer. (Vol. 3, 34:8-9, 72:13-15).

3.      Compulife licenses its software for use by term life insurance agents to perform life insurance policy comparisons. *See* Statement of Uncontested Facts (SUF) ¶ 3 (ECF No. 286-1).

4.      Compulife licenses its software in a stand-alone version that operates on a personal computer ("the PC version"), and as the "Compulife Internet Engine" which runs on a server that can provide insurance quotes to visitors to the Compulife customer's website.  (Vol. 1, 44:9-11, 49:14-16; SUF ¶ 2). Compulife Internet Engine customers typically sell life insurance to the public or service multiple agents as a distributor of life insurance products. (SUF ¶ 4).

5.      The Compulife PC version is sold with a click-through licensing agreement. (Vol. 2, 45:15-18; Vol. 3, 35:10-17). Customers seeking to license the Compulife internet engine version must also license the PC version; customers cannot license the Compulife internet quote engine without also licensing the PC version of the software. (Vol. 2, 45:15-24).

6.      Compulife offers initial thirty-day trials of its PC software to insurance agents. (Vol. 2, 35:16-21; Vol. 3, 40:14-41:16). After the thirty-day trial, potential customers who complete a tutorial can get a four-month free trial subscription with the "web-quote" option. (Vol. 2, 36:1-4; Vol. 3, 35:4-12, 41:19-42:17). Four-month trial customers sign a Compulife licensing agreement. (Vol. 2, 36:5-7). Typically, the four-month free trials translate into sales of licenses for Compulife's software. (Vol. 3, 41:19-42:17).

7.      Compulife also operates the website Term4Sale.com that uses the company's internet engine software operated on Compulife's server. (Vol. 1, 50:11-15, 52:3-6, 53:9-11; Vol. 2, 119:25). Term4Sale.com is a way for consumers to get quotes for life insurance and to find Compulife software customers in their area, who are life insurance agents, from whom they can

buy life insurance. (Vol. 1, 50:16-20).  The insurance agents pay Compulife for this service. (SUF ¶ 5). Term4Sale.com generates income of approximately $125,000.00 to $150,000.00 per year for Compulife.  (Vol. 2, 38:18-22).

8.      Visitors to Term4Sale.com enter their personal information to obtain a quote, including their zip code. (Vol. 1, 52:9-22, 132:8-13; Vol. 2, 37:20). Compulife uses the visitor's zip code to generate the list of up to three Compulife agents in their area to contact to purchase life insurance. (Vol. 1, 52:9-22). Visitors to Term4Sale.com can also send a message to the Compulife agents in their area through the Term4Sale website. (Vol. 1, 132:10-18). Not all insurance companies sell life insurance in all states, so Compulife uses the zip code information to determine which insurance policies from which companies to quote to the consumer. (Vol. 1, 53:3-8).

9.      Prior to September of 2016, Term4Sale.com contained no restrictions limiting the number of quotes a user could generate from Compulife's database or how the quotes were subsequently used. (Vol. 2, 40:21-41:1; Vol. 3, 16:16-25, 97:22-98:17).

10.      Compulife's software relies on a database of life insurance companies' rates that Mr. Barney created. (Vol. 1, 41:8-10; Vol. 2, 120:5-11, 122:18-123:3). There is a difference between insurance rates and insurance quotes: rates are one of the "raw materials" used in developing an insurance premium for a policy; rates are never given to a consumer, instead, rates are used to calculate the premium which is given to a consumer to tell them how much the insurance will cost ("the quote"). (Vol. 1, 45:25-46:9).

11.      Insurance rates are typically public information. (Vol. 1, 42:8-10). Compulife gets its insurance rate information from rate books and rate charts published by life insurance companies. (Vol. 1, 41:12-13). Some life insurance companies do not publish their rates, but Compulife has relationships with most of these companies to obtain their rate information in a

timely manner. (Vol. 1, 41:16-42:4). Compulife's system includes rate tables from over a hundred insurance companies. (Vol. 2, 5:1-3). Compulife's software uses the rate information to generate quotes mathematically. (Vol. 3, 14:12-19).

12.     For insurance rate information to be useful it must be current; based on the relationships that Compulife has developed, insurance companies provide Compulife with their current rate tables before they are released to the public. (Vol. 1, 42:15-24).

13.     When Compulife receives rate information from insurers, sometimes as frequently as every month, Mr. Barney enters the rate information into Compulife's system using Compulife's software and the database that Compulife designed. (Vol. 1, 42:3-5, 44:12-45:9; Vol. 2, 123:4-12). Compulife assigns its own internal four-letter company codes to the different insurance companies whose insurance policy information it inputs into in its database. (Vol. 2, 157:18-158:9, PX 109).[7] Compulife updates its rate information in its software and provides those updates to its customers monthly. (Vol. 1, 48:17-19).

14.     Because the data files could be reverse-engineered if not protected, Compulife designed an encryption system so that if someone outside the company looked at the data files, "it just looks like a bunch of garbage." (Vol. 1, 45:10-20). Both the PC version and the internet quote engine versions of Compulife's software use the same encrypted data files. (Vol. 1, 50:21-51:2).

15.     Mr. Bruner wrote both the Compulife PC version and the Compulife internet engine version of the software in C++. (Vol. 3, 22:15-19, 27:18-23). Bruner also wrote the Compulife HTML Source Code that communicates with the Compulife internet engine. (Vol. 3, 22:17). Compulife's 2001 HTML Source Code was registered with the Copyright Office on May 29, 2015 and assigned Reg. No. TX-8-106-360. (PX 153, 541). Compulife's 2010 HTML Source Code, the

---

[7] Plaintiff's exhibits are referenced by "PX" and Defendants' exhibits by "DX."

updated version of its 2001 HTML Source Code, was registered with the Copyright Office on May 29, 2015 and assigned Reg. No. TX-8-106-364. (Vol. 2, 131:15-21, PX 153, 542).

16.     The Compulife internet engine and HTML work together: "If a person accesses a website that contains the HTML code and inputs the right information, the HTML code will then contact the C++ code, pass information to the C++ code, the C++ code does some computation and passes information back to the HTML code, which then displays it on the website." (Vol. 3, 27:18-23). The Compulife HTML gathers information from the end user such as age, sex, smoking status, and then the HTML calls the Compulife internet engine which calculates an insurance quote and produces the results back to the user. (Vol. 2, 120:18-19, 121:9-17). To accomplish the task of looking up insurance quotes for a user, the HTML code contains different blocks of code: each block of code relates to the different information needed from a user to produce an insurance quote: state selection code[8] (Vol. 2, 139:10-20); birthdate and birth month selection code[9] (Vol. 2, 139:21-140:6); birth year code written in camel case (Vol. 2, 140:7-9); gender selection code[10] (Vol. 2,

---

[8] The state selection code translates each state name into a number, rather than the typical abbreviation of states by two letter acronyms. (Vol. 2, 147:17-19, PX 567). Mr. Bruner testified that he "inherited the code . . . where each state had its own number" from a program that already existed in the Compulife source code library. (Vol. 2, 147:6-11, 182:13-183:4). On cross-examination, Mr. Bruner admitted that the way he programmed the state selection code was a common way of doing it, but that there were many ways to program it differently. (Vol. 3, 6:21-7:2).

[9] The birth month selection code uses "camel case" where two words are combined without a space between them, here "BirthMonth." The second capitalized word forms a hump like that of a camel. (Vol. 2, 148:6-16, PX 567). Camel case is commonly used in computer programming. (Vol. 2, 140:1-2, 184:19-20). The birth months and days in Compulife's code are assigned consecutive numbers and organized to correspond to the way they appear on a calendar. (Vol. 4, 67:25-68:13, 68:20-69:3).

[10] Compulife's HTML only offers a choice between "male" and "female." (Vol. 2, 149:18, PX 567).

140:11-17); smoker/tobacco code[11] (Vol. 2, 140:18-21); health class code[12] (Vol. 2, 140:22-141:7); insurance category code (Vol. 2, 141:8-23); mode used code[13] (Vol. 2, 142:2-5, 154:9-14); the code for sorting output information (Vol. 2, 154:24-155:11); and face amount code (Vol. 2, 142:19-143:4).

17.     In order for the Compulife HTML code to communicate with the Compulife internet engine, the HTML code must send the engine the correct parameters and variables defined in the HTML code; it must be a one-to-one match. (Vol. 3, 27:24-29:3; SUF ¶ 14). The Compulife internet engine is expecting the parameters and variables to come to it in the particular way it is written in the Compulife HTML, and if it does not come to the engine in that way the software will spit out an error message and not produce results. (Vol. 2, 121:18-122:3). The parameters are: "State", "BirthMonth", "Birthday", "BirthYear", "Sex", "Smoker", "Health", "NewCategory", "ModeUsed", "SortOverride1", and "FaceAmount." (Vol. 2, 146:4-8, PX 542, 567). All the parameters must be present, spelled correctly and provided in the correct order for the software to produce quotes. (Vol. 2, 121:18-22). Mr. Barney acknowledged that these variables and parameters are based on standard insurance industry requirements. (Vol. 2, 27:6-16, 28:7-11, 18-25).

18.     The only way to communicate with the Compulife internet engine is to use Compulife's HTML commands in Compulife's HTML code. (Vol. 1, 53:24-25). Compulife's

---

[11] The smoker/tobacco code, which uses camel case, defines a "radio button" to choose between smoker or non-smoker, but it could have been written to use a drop-down choice instead. (Vol. 2, 149:24-150:7, PX 567). Bruner admitted that radio buttons are common in computer programming. (Vol. 3, 1:15-17).

[12] This code defines health by different insurance classifications: PP for preferred plus, P for preferred, RP for regular plus, and R for regular. (Vol. 2, 150:8-17, PX 567).

[13] The "mode used" code gives the annual premium as well as the "modal" premium. The modal premium is monthly, quarterly, or semiannually. (Vol. 2, 154:9-14).

HTML code creates the web page a website visitor sees when they use the life insurance quote engine function. (Vol. 2, 64:20-65:5).

19.     For Compulife customers who want to obtain Compulife's quote system on a single website, Compulife offers a "web quote" option which allows one user access to a copy of Compulife's internet quote engine that Compulife runs on its servers. (Vol. 1, 54:1-7). To use the Compulife web quote option, a user must at least subscribe to "Compulife Basic" which costs $96 a year plus the web quote option for an additional $96 per year, or $192 total per year. (Vol. 1, 54:14-19, Vol. 2, 32:4-13; Vol. 3, 36:12).

20.     Alternatively, Compulife offers the Compulife internet quote engine for more sophisticated customers who have "their own ideas about how they want to present their website to the consumer." (Vol. 1, 54:21-23). The Compulife internet quote engine costs $1,500 per year. (Vol. 1, 54:9-13). Internet quote engine customers can customize Compulife's software to their needs, run the software on their own server, and give third parties access. (Vol. 1, 49:21-50:2, 53:12-21, 54:21-55:13). Compulife does not require the users of the internet version to disclose on their websites that the quotes are being generated by Compulife's software.  (Tr. Vol. 2, 31:12-32:3).

21.     "[I]nternet quote engine users . . . who want to remarket services to other individuals or agencies can do so providing that they make th[at] third party . . . a customer of the PC version of Compulife."  (Vol. 1, 55:7-13). The Compulife internet engine license agreement requires users who access the Compulife internet engine software to have valid Compulife PC licenses. (Vol. 1, 59:14-17, PX 537).

22.     Compulife's licensing agreements provide that Compulife's software constitutes Compulife's valuable trade secrets, contains confidential and trade secret material, and that the

user will not duplicate Compulife's software except for back-up purposes. (Vol. 3, 37:10-40:9; PX 532, 533, 534, 535; SUF ¶ 16). Compulife's licensing agreements prohibit the user from duplicating, reverse compiling, reverse engineering, reformatting, or providing internet web quoting services to sub-users without Compulife's permission. (Vol. 3, 37:10-40:9; PX 532, 533, 534, 535; SUF ¶ 17). Compulife's licensing agreements provide that Compulife displays life insurance quotations on the internet through a proprietary system of template files originally created by Compulife, and that the user will not permit sub-users to re-format a quotation on another computer. (Vol. 3, 37:10-40:9; PX 532, 533, 534, 535; SUF ¶ 19). Compulife licensing agreements provide that Compulife's software includes names of variables and lists of variables which are proprietary to Compulife and subject to Compulife's copyright. (Vol. 3, 37:10-40:9; PX 532, 533, 534, 535; SUF ¶ 20). Compulife's licensing agreements provide that the user's license for Compulife's software is not transferable without the written consent of Compulife. (Vol. 3, 37:10-40:9; PX 532, 533, 534, 535; SUF ¶ 21).

Defendants' Business Activities

23.     Defendant David Rutstein was previously licensed by the Florida Department of Financial Services as an insurance agent. (Vol. 4, 128:13-14, PX 1). On April 19, 2012, David Rutstein agreed in a Consent Order that his insurance license was revoked and he was barred from working in the insurance industry for life in *The State of Florida, Division of Financial Services, in the Matter of David Brian Rutstein*, Case No. 115256-11-AG. (Vol. 1, 129:2-10, Vol. 4, 128:13-14, 128:22-129:7, PX 1). David Rutstein was immediately and permanently removed and permanently barred from any and all direct or indirect participation in and/or affiliation with any entity which is licensed or regulated under the Florida Insurance Code, and any individual or entity which is otherwise involved in the business or transaction of insurance. (PX1; SUF ¶ 30).

24.     David Rutstein founded the National Association of Accredited Insurance Professionals (NAAIP) and purchased the NAAIP.org domain name in 2010. (Vol. 1, 144:13-14, PX 165; SUF ¶¶ 29, 46). By 2016, the ownership of the NAAIP.org website was transferred to Defendant Aaron Levy. (Vol. 1, 145:1-2, PX 165). Defendant Binyomin Rutstein, who is David Rutstein's son, is purportedly NAAIP's president, but according to his father, Binyomin never had any involvement in the company. (SUF ¶¶ 32, 45; Vol. 4, 194:3-5).[14]

25.     NAAIP is a website that creates "free" websites for life insurance agents. (SUF ¶¶ 22, 28). A key benefit offered by a "free" NAAIP website is access to NAAIP's "Life Insurance Quote Engine." (SUF ¶ 23). The "Life Insurance Quote Engine" allows internet visitors to a free NAAIP website to enter certain basic information about their age, insurance rating and type of policy, as well as name telephone number and email address, and the NAAIP "Life Insurance Quote Engine" will provide a list of quotes for term life insurance policies that are available. (SUF ¶ 24).

26.     David Rutstein also founded BeyondQuotes. (SUF ¶ 29). In 2008, the domain registration for BeyondQuotes.com was in Binyomin Rutstein's name (Vol. 1, 145:4-12), but it was later owned by David Rutstein. (Vol. 4, 179:17-19, 183:3-5).

27.     Although he did not have a license to do so, David Rutstein put the Compulife "web quoter" on BeyondQuotes.com, calling it the "Life Insurance Quote Engine," sometime around August 2010. (Vol. 4, 181:9-14, 183:7-23, 186:18). This allowed visitors to www.BeyondQuotes.com to enter certain basic personal information and obtain a list of quotes for term life insurance policies. (SUF ¶ 25). If a visitor wanted to purchase a policy, that visitor

---

[14] Binyomin Rutstein is an insurance agent licensed in 35 different states and is currently appointed as an agent by approximately 19 different insurance companies. (SUF ¶¶ 33, 48). Binyomin Rutstein has never sold a life insurance policy. (SUF ¶ 34).

becomes a "lead" that BeyondQuotes would sell to insurance agents who are its customers. (SUF ¶ 26).

28.    NAAIP's free websites and BeyondQuotes' "Life Insurance Quote Engine" both provide internet visitors the ability to obtain free quotes for term life insurance policies, the same service provided by the Compulife Software and Compulife's www.Term4Sale.com website. (SUF ¶ 35).

29.    American Web Designers, Ltd. ("AWD") is owned by Binyomin Rutstein and is licensed as an insurance agency. (Vol. 4, 134:21-22, 135:14-16, 177:14-23). To have a license for an insurance agency in Florida, there must be an individual who stands as the principal for that agency; Binyomin Rutstein is the licensed insurance agent in Florida for American Web Designers. (Vol. 1, 146:11-18, PX 564).

30.    Binyomin gave permission for David to use Binyomin's insurance license. (Vol. 4, 194:10-14).  David Rutstein opened AWD's bank account with Bank of America by presenting his passport with his photograph as identification and became an authorized signor on that account. (Vol. 4, 137:14-138:25, PX 106).

31.    Brian McSweeney is an insurance agent with MBM Life Quotes, Inc. *See* McSweeney 2017 Trial Tr. 168:13-20 (PX 569). MBM Life Quotes was a Compulife customer with a license for the PC version of Compulife's software and access to its web quoter. (Vol. 3, 72:16-73:3).

32.    In August 2011, David Rutstein used AWD to enter into an agreement with Brian McSweeney whereby for every lead Mr. McSweeney received that became a sale of an insurance policy, a "lead generation fee" was paid to AWD. (Vol. 4, 180:4-181:11; PX 28). Mr. McSweeney paid Defendants over $75,819.00 in exchange for sales leads that Defendants provided to Mr.

McSweeney (generated from BeyondQuotes.com) while Compulife's software and data were used on the website. (PX 569 at 218:6-10, PX 30).

33.     MSCC Corporation, owned by Michael Steinhardt, sold internet software to insurance agents and was an authorized re-seller of Compulife's software for approximately 20 years. *See* Steinhardt Dep. Tr. 7:3-5, 9:5-13 (PX 566).  MSCC had Compulife's internet quote engine software installed on its website; before MSCC's customers could use Compulife's software on its website, MSCC verified that the customer was a subscriber of Compulife's PC service.  (*Id.* at 9:16-10:25). Until May 2015, MSCC was not required to sign a licensing agreement with Compulife or pay it for its use of Compulife's internet quote engine. (Vol. 2, 46:10-23).

34.     Mr. McSweeney of MBM Life Quotes, Inc. instructed MSCC to put a web quoter on BeyondQuotes.com that was connected to MSCC's server.  (PX 566 at 33:14-20; PX 569 at 193:23-194:12).[15]  Mr. Steinhardt believed that BeyondQuotes.com was owned by Mr. McSweeney, although he never verified that. (PX 566 at 37:8-13).

---

[15] Unbeknownst to Compulife, David Rutstein's access to Compulife's HTML code and database dated back to August 2011, when David Rutstein emailed Brian McSweeney and service@compulife.com, with the subject line "Dear Compulife – I have an account with you through Eric Savage." (DX 1). The email requested assistance from Compulife to put a quote engine on www.BeyondQuotes.com. The email said, "I also work with Brian McSweeney of www.BMlifequotes.com." (DX 1; Vol. 4, 181:17-20).

Jeremiah Kuhn of Compulife received the email and believed that David Rutstein was a website designer for Eric Savage (a Compulife subscriber) and Brian McSweeney. (Vol. 3, 75:14-25, 76:13-16). Mr. Kuhn thought BeyondQuotes.com was owned by Mr. McSweeney or Mr. Savage. (Vol. 3, 79:7-13). Mr. Kuhn provided the Compulife HTML quoter code to David Rutstein. (Vol. 3, 81:7-11, 106:24-107:6, DX 4). Had Mr. Kuhn known the truth about David Rutstein and that he intended to use the Compulife HTML quoter code on BeyondQuotes.com and NAAIP.org without paying a licensing fee, Mr. Kuhn never would have provided the Compulife HTML code to David Rutstein. (Vol. 3, 107:23-108:7).

Sometime thereafter, David Rutstein, via Mr. McSweeney, had the internet quoter on BeyondQuotes.com changed from Compulife's server to MSCC's server. (Vol. 4, 184:3-185:9).

35.    MSCC provided Compulife's HTML source code for the web quoter to be used on BeyondQuotes.com, which incorporated Compulife's field names and values.  (*Id.* at 13:4-14, 48:12-49:6).

36.    A Compulife licensee can only put Compulife's web quoter on their own website; putting it on a website they do not own would be in breach of the license agreement. (Vol. 3, 77:4-7).

37.    One Resource Group ("ORG") is a life insurance wholesaler that entered into an agreement with AWD dated March 24, 2014. (PX 42). Pursuant to the agreement, ORG paid AWD $108,406.87 in commissions from sales of insurance policies by NAAIP.org members during the period of time that NAAIP used Compulife's software and data. (Vol. 1, 148:1-12, PX 43). David Rutstein confirmed that NAAIP.org received that approximate amount from ORG over a two-to-three-year period. (Vol. 4, 191:3-12).

Compulife's Investigation of Defendants

38.    On April 8, 2015, Mr. Barney received a telephone call from a Compulife customer alerting him to the existence of the NAAIP.org webpage. (Vol. 1, 59:21-60:6). Mr. Barney ran a quote on the NAAIP website and immediately recognized company names and product names from Compulife's software because they appeared exactly as he had entered the information in the Compulife database. (Vol. 1, 64:9-14, 66: 21-23).

39.    After he discovered NAAIP, Mr. Barney called the telephone number on the NAAIP.org webpage, and a man by the name of David Gordon answered the phone. (Vol. 1, 70:16-20).  Based on common addresses and phone numbers, Mr. Barney and Mr. McSweeney concluded that David Gordon is an alias for David Rutstein. (Vol. 1, 121:21-22, 127:20-128:24, 137:2-5; PX 569 at 183:11-22, PX 32).

40.     On April 9 and 10, 2015, Mr. Barney sent emails to support@naaip.org advising that it was using Compulife's software without permission or license and advising NAAIP to stop. (PX 129).

41.     On April 10, 2015, Mr. Barney printed out the source code used on the NAAIP website. (Vol. 1, 67:20-24, PX 149). Not all of the 25 pages of code Mr. Barney reviewed was taken from Compulife but beginning at line 503, Mr. Barney recognized Compulife's HTML code used to communicate information to Compulife's internet engine software. (Vol. 1, 68:15-69:7, compare PX 149 to PX 542). The state selection code and "State" parameter were identical. (Vol. 2, 148:3-5, PX 567 (Bruner Demonstrative 1 comparing PX 149 to PX 542) at 5-7). The birthday and birth month selection code and "Birthday" and "BirthMonth" parameters were identical. (Vol. 2, 148:8-22, PX 567 at 9-10). The birth year selection code and "BirthYear" parameter was identical. (Vol. 2, 148:24-25, PX 567 at 11). The gender selection code and "Sex" parameter were identical. (Vol. 2, 149:14-16 at 12). The smoker selection code and "Smoker" parameter were identical. (Vol. 2, 149:21-22, PX 567 at 13). The health class code was identical except NAAIP changed "Standard" to "Regular"; the "Health" parameter and values of "PP", "P", "RP", and "R" were identical. (Vol. 2, 150:8-151:9, PX 567 at 15). The new category code was identical for categories corresponding to term insurance policies for 5 years, 10 years, 15 years, 20 years, 25 years, 30 years, to age 70, to age 75; the "NewCategory" parameter and the category selection variables for the categories copied were identical. (Vol. 2, 152:20-24, PX 567 at 20-21). The mode used code and parameter for monthly premium was identical. (Vol. 2, 154:19, PX 567 at 22). The code for sorting output information was identical. (Vol. 2, 155:1, PX 567 at 23).

42.     On April 10, 2015, Mr. Barney's investigation led him to the website at www.BeyondQuotes.com, which was also using Compulife's HTML code. Mr. Barney ran an

insurance quote on the website. (Vol. 1, 76:6-13, PX 448). Mr. Barney then used the contact form at the BeyondQuotes.com website to contact the owner; Mr. Barney received a response email from info@beyondquotes.com that indicated it came from "Agent Republic." (PX 33).  Mr. Barney looked up "Agent Republic" in Compulife's customer records and found that "Agent Republic" was connected to Compulife customer Brian McSweeney. (Vol. 1, 77:6-22).

43.     Mr. Barney contacted Mr. McSweeney who believed that the quotes may have been coming from his account with MSCC, so Mr. Barney contacted Michael Steinhardt at MSCC. (Vol. 1, 77:19-22, 79:18-23). Mr. Steinhardt recognized the HTML code on www.NAAIP.org as belonging to Compulife. (PX 566 at 21:21-22:13; PX 157). Mr. Steinhardt determined that the account being used to produce the quotes at NAAIP.org belonged to Mr. McSweeney. (PX 566 at 19:5-20:13). Mr. Steinhardt disabled Mr. McSweeney's account's access to the Compulife internet engine software running on MSCC's server. (PX 566 at 19:5-20:13; PX 157). This immediately stopped NAAIP.org websites and the www.BeyondQuotes.com website from producing life insurance quotes. (PX 566 at 19:5-21:20; Vol. 1, 106:3-10, PX 157).

44.     Shortly thereafter, on Monday, April 13, 2015, Mr. McSweeney received a message from David Rutstein that said "the compulife guy disabled my quote engines…which may have been coming from you." (PX 569 at 184:10-18, PX 36, DX 38). That same day, Gordon/Rutstein sent an email to Mr. Barney threatening to steal Compulife's Term4Sale customers. (Vol. 1, 105:3-13, PX 129). On April 25, 2015, Gordon/Rutstein made similar threats to Compulife's business by email. (Vol. 1, 112:13-19, PX 253, DX 99).

45.     On June 5, 2015, Gordon/Rutstein used Compulife's Term4Sale website to generate hundreds of life insurance quotes; after he was presented with each quote, he sent messages through the Term4Sale website to the Compulife insurance agent customers stating:

"Compulife quote engine: Beware of security flaw. Your back office is not password protected," and provided a hyperlink to NAAIP followed by the statement "term life quote engines are free." (Vol. 1, 131:13, 132:10-133:17, PX 272, 273). As a result, Mr. Barney was forced to do "damage control" with his customers, some of whom thought that the contacts they normally would receive from the Term4Sale website were being diverted somewhere else. (Vol. 1, 133:18-137:1; Vol. 2, 42:1-11).

46.     Between April and May of 2015, Mr. Barney reviewed hundreds of NAAIP free agent websites at www.NAAIP.org and used the "Wayback Machine" at www.archive.org to review the websites as they appeared in the past; the source code for all of these other agent websites at www.NAAIP.org featured a life insurance quoter and contained Compulife's HTML source code.  (Vol. 1, 87:14-23, 89:2-91:14, 92:2-16, 93:3-94:17, 95:3-96:16, 97:2-98:9, 99:8-101:6, PX 551, 552, 553, 554, 555).

47.     In June of 2015, Compulife's quotes began appearing on the NAAIP.org website again. Mr. Barney recognized the quotes as his information coming from Compulife's database in Compulife's software. (Vol. 1, 114:16-117:19, PX 291, 292, 309 and 1-S).

48.     Defendants had no authority to use Compulife's software. (Vol. 2, 111:6-8). Defendants never had authority to use Compulife's data to generate life insurance quotes. (Vol. 2, 112:2-4). Compulife never intended to provide such authorization. (Vol. 2, 114:13-17).

49.     In response to Defendants' activities, Compulife modified its software to detect and prevent similar situations in the future, such as having its internet engine software check for valid software serial numbers when information is requested from the internet engine and adding a "watermark" to its insurance quotes. (Vol. 1, 119:4-16; Vol. 2, 120:24-121:6, 126:22-127:8, PX 568 at 36). Compulife's expert in software design, Nancy Miracle, described this watermarking

system as an effective way for Compulife to identify whether the data displayed on a website is Compulife's data and, if so, the source of that data; according to Ms. Miracle, the watermark is unique and difficult to detect. (Vol. 4, 6:19-7:16). Ms. Miracle tested the watermark system and confirmed it worked as described by Compulife. (Vol. 4, 8:16-22).

The Scraping Attack

50. During September 1-4, 2016, Compulife's Term4Sale.com website experienced a "scraping" attack. (Vol. 2, 133:22-134:4). Over 800,000 "get" requests were sent to the Term4Sale.com server, each request consisting of a single line of code. (PX 200). The Term4Sale server logged the IP address generating each quote request, the date and time the request was made, and the request itself. (Vol. 2, 134:15-17).

51. Defendant Moses Newman, who began programming for NAAIP.org in April 2016, testified that an Israeli woman named Matal performed the scaping attack. (Vol. 4, 109:19-110:6). While living in Tel-Aviv, Israel, Mr. Newman watched Matal use a computer to send automated requests in a way that was consistent with scraping. (Vol. 4, 110:3-6; Vol. 5, 67:22-68:3).[16] The requests Matal sent were for two zip codes: 10458 in Bronx, New York, and 33433 in Boca Raton, Florida. (Vol. 4, 113:2-6). Matal took the information from the scraping attack and put it in a large CSV file, which Mr. Newman then integrated into the database that provided quote information to NAAIP.org websites. (Vol. 4, 110:7-18). Mr. Newman acknowledged the information in the CSV file came from Compulife's Term4Sale website. (Vol. 4, 114:5-9). Mr. Newman was paid for his work from a Paypal account that he thought belonged to Aaron Levy.

---

[16] Mr. Newman later confirmed that Matal had carried out the scraping attack on Compulife, testifying, "I wanted to know who scraped it and what was scraped. I believe Aaron Levy told me there is this girl, Matal, that did it." (Vol. 4, 115:6-9).

(Vol. 4, 112:20-24; Vol. 5, 47:9-16). The CSV files were never produced to Compulife during discovery because they were routinely deleted. (Vol. 4, 110:19-21).

52.     Both Mr. Bruner and Compulife's expert Nancy Miracle testified as to what occurred during the scraping attack. (Vol. 2, 161:21-172:13, PX 568; Vol. 4, 10:20-27:18, PX 550). A single internet protocol (IP) address (which Mr. Bruner traced to a computer or server in Jerusalem, Israel) sent over 800,000 requests to the Term4Sale server over a four-day period; each request used the parameters in Compulife's HTML code while incrementing the corresponding variables one at a time, thus scraping the Compulife database. (Vol. 2, 134:1-4, 135:10-24; Vol. 3, 19:25-20:13; PX 200). The attack sent requests for information for two zip codes: 10458 in Bronx, New York, and 33433 in Boca Raton, Florida. (Vol. 2, 160:8-21). The attack on the Compulife internet engine server at Term4Sale.com used the same parameters from the Compulife HTML code -- spelled, formatted, and organized identically to how they appear in Compulife's code registered with the Copyright Office. (Vol. 2, 121:18-22, 163:21-165:8; Vol. 4, 15:19-16:2).

53.     Mr. Bruner compared the quotes that NAAIP produced after the scraping attack and they matched the quote information obtainable at Compulife's Term4Sale website exactly, except that NAAIP rounded down to whole dollars. (Vol. 2, 172:7-12, PX 568 at 36-40). Ms. Miracle also examined the quotes NAAIP produced and found Compulife's digital watermarks in the quotes. (Vol. 4, 8:23-10:14).

54.     Mr. Bruner also examined software code produced by Defendants. (PX 107). In Defendants' code Mr. Bruner found 111 company codes that Mr. Barney had created, which corresponded to insurance company names and ratings. (Vol. 2, 156:9-160:3). Ms. Miracle examined the software code Defendants produced as well. (Vol. 4, 25:20-23). Ms. Miracle discovered that Defendants have a database on the NAAIP server that contains quote information

with specific fields that match Compulife's parameters and zip codes that correspond to the two zip codes scraped in the attack on the Term4Sale website. (Vol. 4, 25:25-26:23).

55.     Ms. Miracle estimated the scraping attack produced 43.5 million results. (Vol. 4, 9:12).[17] Defendant Newman disputed that number; he testified that NAAIP.org's database only contained "three million or so" quotes. (Vol. 4, 117:16-118:8). Mr. Newman agreed that three and a half million quotes was not an insignificant amount because, as he admitted candidly, "nobody wanted to be scraped, and nobody ever wants to be scraped." (Vol. 4, 120:10-11).

56.     Prior to 2016, Term4Sale.com had no process in place by which to restrict the use of "get" commands to generate insurance premium quotes.  (Tr. Vol. 2, 177:22-178:3; Tr. Vol. 4, 93:11-14).

57.     In response to the scraping attack, Compulife modified its internet engine so that if more than five requests are quotes are made within one second the software starts slowing down and produces fewer results. (Vol. 2, 125:23-126:2, 181:1-11). Compulife also added a terms of use agreement to the Term4Sale website. (Vol. 2, 41:7-14).

Decline in Compulife's Sales

58.     Mr. Barney performed further research on whether NAAIP continued to use Compulife's software, and he found quotes on the NAAIP website that came from the Compulife software as recently as the Spring of 2019. (Vol. 2, 107:2-6, 108:4-109:4).

59.     Compulife lost business it otherwise expected to receive during the period of time that NAAIP operated. Between 2012 and 2019, the number of free trials Compulife gave out to potential customers declined, and the number of those trials that converted to four-month free

---

[17] Compulife estimates that the scraping incident caused 870,000 requests to be made at Term4Sale.com over a four-day period and that each request usually generates 50 quotes, resulting is 43.5 million quotes.  (Tr. Vol. 2, 161:25-162:3; Tr. Vol. 4, 9:8-12).

subscriptions declined. During that same period the number of four-month subscribers who converted to paying annual subscription customers also declined. Compulife would have charged each agent an annual licensing fee for their use of Compulife's software and data. (Vol. 3, 43:20-54:2, PX 151, 546, 547).

60.    Compulife acknowledges that more competitors have entered the market in the last five years, which may have contributed to the loss of Compulife's customers. (Vol. 3, 93:24-94:19).

## CONCLUSIONS OF LAW

### I.    Law of the Case Doctrine

In its decision remanding these matters, the Eleventh Circuit made several findings that I am bound by as law-of-the-case.  The first establishes the existence and validity of Compulife's copyright. *Compulife Software Inc.,* 959 F.3d at 1301.[18]  The second is that Defendants engaged in factual copying.  *Id.* at 1302.  The third is that Compulife's alphabetization of the 50 states is "unoriginal and unprotectable." *Id.* at 1307.  The fourth is that Compulife's Transformative Database constitutes a trade secret.  *Id.* at 1311.[19]

"Under the law-of-the-case doctrine, [the resolution of] an issue decided at one stage of a case is binding at later stages of the same case."  *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1291 (11th Cir. 2005) (quoting *Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1313 (11th Cir. 2000).  "The doctrine operates to preclude courts from revisiting issues that were decided explicitly or by necessary implication in a prior appeal." *Schiavo*, 403 F.3d at 1291 (citing *Luckey*

---

[18]  Defense counsel conceded this point in her closing argument.  ECF No. 313 at 26:13-15.

[19]  The Eleventh Circuit stated, "[t]he magistrate judge found that Compulife's Transformative Database was a trade secret, a finding that is not clearly erroneous and that, in any event, doesn't seem to be contested on appeal. We can therefore move straight to the question of misappropriation." *Compulife Software Inc.,* 959 F.3d at 1311.

*v. Miller*, 929 F.2d 618, 621 (11th Cir. 1991)).   The only time that the doctrine does not bar reconsideration of an issue is when "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to that issue, or (3) the prior decision was clearly erroneous and would work manifest injustice." *Silva v. Baptist Health S. Fla., Inc.*, 838 F. App'x 376, 383 (11th Cir. 2020) (citing *Wheeler v. City of Pleasant Grove*, 746 F.2d 1437, 1440 (11th Cir. 1984).   None of these exceptions applies here.

Thus, to the extent that either party attempts to relitigate these issues, I am bound by the Eleventh Circuit's findings and there is no basis for me to engage in reconsideration.

## II.   Copyright Infringement

As the Eleventh Circuit's remand order sets forth, "To succeed on its claim of copyright infringement, Compulife 'must prove (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Compulife Software Inc.,* 959 F.3d at 1301 (quoting *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1541 (11th Cir. 1996)).   Given the Eleventh Circuit's determination that "[t]he existence and validity of Compulife's copyright are undisputed," on remand, I am to "proceed directly to the second prong—copying" which involves an analysis of  "factual and legal copying," both of which Compulife has the ultimate burden to prove.   *Compulife Software Inc.,* 959 F.3d at 1301 (citing *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1148 n.40 (11th Cir. 2007)).

Here, too, the Eleventh Circuit has already determined that Defendants' factual copying of Compulife's copyrighted material is undisputed, and thus, only the issue of legal copying remains to be decided.   An analysis of legal copying begins with the Defendants' burden to prove (as part of the filtration process explained below) that the elements they copied from Compulife's copyrighted work are unprotectable.   *Compulife Software Inc.,* 959 F.3d at 1305.   Then, "[a]fter

filtration is complete, the burden shifts back to [Compulife] to prove substantial similarity between any remaining (i.e., unfiltered) protectable material and the allegedly infringing work." *Id.* at 1306.

a. Factual and Legal Copying

As set forth above, Compulife has the burden to prove that Defendants engaged in both factual and legal copying. Factual copying (Defendants' actual use of Compulife's material) can be shown either by direct evidence, or it may be inferred from indirect evidence by demonstrating that Defendants had "access to the copyrighted work and that there are probative similarities between the allegedly infringing work and the copyrighted work." *Compulife Software Inc.,* 959 F.3d at 1301 (quoting *MiTek Holdings, Inc. v. Arce Eng'g Co.,* 89 F.3d 1548, 1554 (11th Cir. 1996). The Eleventh Circuit concluded that "[f]actual copying isn't really disputed here, and we think it has been established, in any event, so we focus here on legal copying." *Compulife Software Inc.,* 959 F.3d at 1302.[20]

"'Legal'—or 'actionable'—copying occurs when "those elements of the [copyrighted work] that have been copied are protected expression and of such importance to the copied work that the appropriation is actionable." *Id.* (quoting *Peter Letterese & Assocs. v. World Inst. of Scientology Enters.,* 533 F.3d 1287, 1300 (11th Cir. 2008)). "In most cases, a 'substantial similarity' between the allegedly offending program and the protectable, original elements of the copyrighted works establishes actionable copying." *Compulife Software Inc.,* 959 F.3d at 1302 (quoting *Bateman,* 79 F.3d at 1542); *see also BUC,* 489 F.3d at 1149 n.42 ("the 'substantial similarity' standard [is] the default mode of analysis for compilation copyright claims.").

_____

[20] According to the Eleventh Circuit, "[Defendant] David Rutstein frankly admits that the defendants had access to Compulife's copyrighted HTML. Further, his testimony strongly suggests copying in fact . . . [and] defendants make similar admissions in their brief to us . . . All of which is to say that the defendants have conceded access, at the very least, and they don't meaningfully dispute factual copying." *Compulife Software Inc.,* 959 F.3d at 1302, n.5.

"[B]ecause 'a small portion of the structure or code of a [computer] program may nonetheless give it distinctive features or may make the program especially creative or desirable,' copying of that portion is actionable." *Compulife Software Inc.,* 959 F.3d at 1302 (quoting 4 Nimmer on Copyright § 13.03[F][5] (2019)).  Notably, when considering factual compilations, the "substantial similarity" test is "narrowed" because "the components of a compilation are generally in the public domain, and a finding of substantial similarity . . . as to matters in the public domain will not suffice to prove infringement." *BellSouth Advert. & Pub. Corp. v. Donnelley Info. Pub., Inc.*, 999 F.2d 1436, 1445 n.22 (11th Cir. 1993).

"Substantial similarity 'must be assessed with respect to both the quantitative and the qualitative significance of the amount copied to the copyrighted work as a whole.'" *Compulife Software Inc.,* 959 F.3d at 1302 (quoting *Peter Letterese*, 533 F.3d at 1307).  Quantitatively insubstantial copying may still be actionable if it is qualitatively substantial.  *Compulife Software Inc.,* 959 F.3d at 1302.

b.  Filtration

According to the Eleventh Circuit,

> Before comparing two works to determine if they display the required substantial similarity, a court must "eliminate from comparison the unprotectable elements of" the copyrighted work. This process—known as "filtration"—is necessary because even substantial similarity between a copyrighted work's unprotectable elements and a purportedly infringing work isn't actionable, regardless of how many unprotectable elements are copied or how important they may be.

*Compulife Software Inc.,* 959 F.3d at 1303 (quoting *Bateman*, 79 F.3d at 1544-45).  At this filtration stage, Defendants bear the burden of showing that the copied material is unprotectable and should be filtered out of the analysis before the Court compares the two works. *Compulife Software Inc.,* 959 F.3d at 1306. "If the defendant demonstrates—at the filtration stage—that it copied only unprotectable material, such that no substantial similarities remain after filtration, the

defendant is entitled to summary judgment." *Id.* at 1306.  However, "where the defendant's evidence is insufficient to prove that a particular element is unprotectable, the court should simply assume that the element is protectable and include that element in the final substantial-similarity comparison between the works." *Id.*

The Supreme Court has held that "[t]he *sine qua non* of copyright is originality.  To qualify for copyright protection, a work must be original to the author." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345, 111 S. Ct. 1282, 1287, 113 L. Ed. 2d 358 (1991) (citation omitted).  "Original . . . means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity . . . the requisite level of creativity is extremely low; even a slight amount will suffice." *Id.*  "The fact that computer programs are primarily functional makes it difficult to apply traditional copyright concepts in that technological world." *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1208, 209 L. Ed. 2d 311 (2021).  Thus, "in determining the lawful scope of a computer program copyright," it is important to "distinguish between expressive and functional features of computer code." *Id.,* 141 S. Ct. at 1198.

In its remand decision, the Eleventh Circuit noted that "some filtration is warranted here [because] [s]ome elements of Compulife's code are unprotectable—and indeed, are so obviously so that no proof is necessary." *Compulife Software Inc.,* 959 F.3d at 1307 (referring to Compulife's alphabetization of the 50 states, which the Court deemed "unoriginal and unprotectable").

There are a variety of reasons why copied material may be unprotectable.  For example, "copyright protection extends only to a work's expressive elements, not to any underlying 'idea, procedure, process, system, method of operation, concept, principle, or discovery' expressed therein." *Id.* at 1304 (quoting 17 U.S.C. § 102). *See also Oravec v. Sunny Isles Luxury Ventures,*

*L.C.*, 527 F.3d 1218, 1224 (11th Cir. 2008) (copyright protection extends only to a "particular expressions of ideas").

> For example, it is well settled that
>
> [F]acts do not owe their origin to an act of authorship. The distinction is one between creation and discovery: The first person to find and report a particular fact has not created the fact; he or she has merely discovered its existence . . . The discoverer merely finds and records. Census takers, for example, do not "create" the population figures that emerge from their efforts; in a sense, they copy these figures from the world around them. Census data therefore do not trigger copyright because these data are not "original" in the constitutional sense . . .
>
> Factual compilations, on the other hand, may possess the requisite originality. The compilation author typically chooses which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers. These choices as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original that Congress may protect such compilations through the copyright laws. Thus, even a directory that contains absolutely no protectible written expression, only facts, meets the constitutional minimum for copyright protection if it features an original selection or arrangement.

*Feist Publications, Inc.*, 499 U.S. at 347–48, 111 S. Ct. 1282, 1288–89 (quotations and citations omitted).

Another possible basis for finding a work unprotectable is the merger doctrine.  Its premise is that "some expression may be so intrinsic to the communication of an idea—or procedure, process, etc.—that it is considered to have 'merged' into the idea.  According to the merger doctrine, where there are sufficiently 'few ways of expressing an idea, not even the expression is protected by copyright.'"  *Compulife Software Inc.,* 959 F.3d at 1304 (quoting *BUC*, 489 F.3d at 1143); *see, e.g., Morrissey v. Procter & Gamble Co.*, 379 F.2d 675, 678–79 (1st Cir. 1967) (rules governing a sweepstakes were unprotectable because the ideas expressed were "so straightforward and simple" that "at best only a limited number" of possible modes of expression could exist to convey them).

Likewise, as noted above, "material taken from the public domain is unprotected, even if incorporated into a copyrighted work." *Compulife Software Inc.,* 959 F.3d at 1304 (citing *Stewart v. Abend*, 495 U.S. 207, 234, 110 S. Ct. 1750, 109 L. Ed. 2d 184 (1990) (holding that an author "may receive protection only for his original additions," not "elements . . . already in the public domain").

In its remand decision, the Eleventh Circuit noted that "elements of computer source-code expression 'dictated by external factors' aren't entitled to copyright protection." *Compulife Software Inc.,* 959 F.3d at 1304-05 (quoting *Bateman*, 79 F.3d at 1546-47 and *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 709 (2d Cir. 1992) ("compatibility requirements and industry demands ... [can make it] 'virtually impossible to write a program to perform particular functions in a specific computing environment without employing standard techniques.'")). Thus, "[t]he author of a copyrighted code can't obtain protection for such standard modes of expression, lest he effectively monopolize an underlying 'idea.'" *Compulife Software Inc.,* 959 F.3d at 1305.

In sum, "filtration should eliminate from comparison the unprotectable elements of ideas, processes, facts, public domain information, merger material . . . and other unprotectable elements." *Id.* (quoting *Bateman*, 79 F.3d at 1545).

Here, Defendants assert that Compulife's 2010 HTML source code is not protectable because "the variable terms needed to calculate life insurance premiums, such as sex, amount, health, age and location, are generally standard for the life insurance industry" and Compulife's use of common names for these variables ("State," "sex," etc.) are "elements taken from the public domain." ECF No. 306 at 19-20. Defendants argue that "inputs into the quoter are dictated by the insurance industry," and "there are very few ways to create a form to collect the necessary information to generate a quote." *Id.* at 19. Defendants contend that that a "menu" is merely "an

idea, a concept for how to display options to generate an insurance quote," and therefore, it is not a protected expression. *Id.* at 20.

Likewise, Defendants argue that "alphabetization of the states, as well as the chronological order of the birth months, birthdays and birth years and ascending order of policy amounts are 'dictated solely by logic and efficiency' and therefore, [are] unprotectable." *Id.* Defendants rely upon Mr. Bruner's testimony that he did not create the "states" portion of the Compulife source code to argue that it is not an original work. *Id.* Defendants also contend the "computer language" used to create the website quoter such as "tr" for "table rows" is unprotectable because it is dictated by "computer-industry programming and practices." *Id.* According to Defendants, once the unprotected lines of code are filtered out from Compulife's 2010 HTML source code, any copying of the remaining lines of protectable code is minimal and does not amount to infringement. *Id.* In fact, Defendants contend that only nine lines of Compulife's code are protectable. *Id.*

Notwithstanding that the Eleventh Circuit holds a contrary view, Compulife appears to argue that all of its code is protectable. According to Compulife, its 2010 HTML code is "original creative authorship entitled to copyright protection [because] Bruner, Compulife's programmer, wrote the 2010 HTML code himself and did not copy it from anyone else." ECF No. 307 at 39-40. Compulife relies on the testimony of its expert, Ms. Miracle, claiming, without citation to the trial transcript that she "opined that the 2010 HTML code contained numerous creative elements including a creative way to identify and organize variables related to requests for insurance quotation information." *Id.* at 40.[21] Compulife argues that Defendants failed to satisfy their burden

---

[21] I will disregard Ms. Miracle's opinions regarding the creativity and originality of Compulife's code because these constitute legal conclusions. *See United States v. Delatorre*, 308 F. App'x 380, 383 (11th Cir. 2009) ("[A]n expert witness may not testify as to h[er] opinion regarding ultimate legal conclusions").

of proof by refuting this testimony with any evidence showing that the code was unoriginal. *Id.* at 40. I disagree.

During the trial, defense counsel elicited testimony that Bruner copied parts of the 2010 HTML code. Moreover, both Mr. Bruner and Ms. Miracle testified that camel case is commonly used in computer programming. Although Defendants did not present an expert witness, the simplicity of Compulife's code is such that I am capable of assessing its originality and protectability.

As noted above, to obtain copyright protection, a work must be independently created by the author and must possess at least a minimal degree of creativity. Even though the requisite level of creativity is "extremely low," in performing the filtration analysis I must be mindful that "compatibility requirements and industry demands . . . [make it] 'virtually impossible to write a program to perform particular functions in a specific computing environment without employing standard techniques'" and that "where there are sufficiently 'few ways of expressing an idea, not even the expression is protected by copyright.'" *Compulife Software Inc.,* 959 F.3d at 1304-05 (citations omitted). I am also mindful that factual compilations, like the ones performed by Compulife's software in compiling facts about the consumer's biographical information and the rates used by insurance companies to generate a quote, must involve some creativity (in terms of the facts Compulife chose to include and how to arrange the collected data) to be protectable.

As an initial matter, I find that although Compulife presented evidence that Defendants factually copied the variables and parameters from its 2010 HTML Source Code,[22] Defendants succeeded in proving that the majority of the program's copied elements are unprotectable.[23]

First, Compulife's closed menu of limited options from which the end user must select to enable Compulife's program to produce a life insurance quote falls within the merger doctrine. As set forth above, when the expression is so intrinsic to the communication of a procedure or process, courts will find that the two have merged. This typically occurs when there are only a limited number of ways to present an idea. Here, as Mr. Barney conceded, it is an insurance industry standard to ascertain an applicant's age, gender, health, and location in preparing a life insurance quote. It is indisputable that there are only few methods by which Compulife can gather and compile the information needed to generate a life insurance quote. Thus, Compulife's use of a radio button, as opposed to a drop-down menu, to identify the applicant's gender does not constitute an original expression. *See BUC Int'l Corp.*, 489 F.3d at 1143 (The Eleventh Circuit found that the image of a circle with a diagonal line crossed through it to express the idea that

---

[22] *See Compulife Software Inc.,* 959 F.3d at 1299 ("A comparison of the HTML used by the defendants with Compulife's HTML source code shows without a doubt that the defendants copied some of it, although . . . the legal significance of that copying is disputed."). *See id.* at 1310 ([e]ven a cursory comparison . . . suggests that the defendants' work copied material from nearly every page of the copyrighted work. The defendants' code includes nine of the eleven basic sections of Compulife's code, arranged in almost exactly the same order.").

[23] As the Eleventh Circuit set forth, Defendants must "identify the species of unprotectability" and "present supporting evidence where appropriate." *Compulife Software Inc.,* 959 F.3d at 1306. "If, for instance, the defendant believes that some part of the copyrighted work is in the public domain, he must narrow the inquiry by indicating where in the public domain that portion of the work can be found. Similarly, if he thinks that what he copied amounts to usual industry practice, he must indicate the standards that dictate that technique. The plaintiff then faces the manageable task of 'respond[ing],' to the appropriately narrowed issue." *Id.* (quoting *Bateman*, 79 F.3d at 1542).

something is not allowed would not qualify as protected expression because there are few ways of visually presenting the idea that an activity is not permitted.).

Moreover, Defendants established that Mr. Bruner copied the source code for the organization of the states from a pre-existing library that he "inherited," which renders that portion unoriginal and thus unprotectable.  I find Comulife's use of "FaceAmount" to name the parameter that identified the amount of the life insurance policy sought to be unoriginal.[24]  Compulife's witnesses acknowledged that the use of camel case in computer programming is common, which by definition means that it is not original.  Similarly, I find that the traditional numeric sequencing of birth months, dates and years is logical, most efficient, and that they could not reasonably be presented in an alternative manner.  Mr. Bruner's testimony that "I could have called [birth year] whatever I wanted" (Vol. 2, 149:1-4) does not convince me that his decision to name that parameter "BirthYear" rises to the level of creative or original expression.

Notably, even the report produced by Compulife's expert, Ms. Miracle, does not opine that these obviously-named parameters are protectable.[25]  Rather, Ms. Miracle points to only a few parameters that she contends are "purely arbitrary and not dictated by any external factor."  (PX 173 at 17-18).  These include "SortOverride1", "HealthClass" and "NewCategory".  *Id.*  In her closing argument, defense counsel conceded that these parameters are unique.  ECF No. 313 at 36.

---

[24]  During her cross-examination of Ms. Miracle, defense counsel introduced the source code from another life insurance-quoting website (unaffiliated with Defendants) called WinQuote, to show that it used many of the same parameter names as Compulife and therefore, they are not original. DX 116.

[25]  Notably, Compulife relied on the expert report that Ms. Miracle prepared for the first trial of these matters, dated December 1, 2016.  (PX 173).  The report would have benefitted from some updating to reflect the issues in dispute during this trial.  For example, Ms. Miracle's report states, "I am unaware of any argument that . . . these elements are unworthy of copyright protection" (*id.* at 16), even though the protectability of Compulife's variables and parameters was hotly contested during this trial.

However, Mr. Bruner's testimony comparing the "HealthClass" variables used in its source code to those used by NAAIP revealed that there are differences.  Compulife uses preferred plus (PP), preferred (P), regular plus (RP), and regular (R), whereas the text displayed on NAAIP's website uses "standard" and "standard plus" instead of "regular" and "regular plus."  (Vol. 2, 140:24-141:7).  Mr. Bruner also testified that Compulife "never use[s]" the "SortOverride" parameters.  (Vol. 2, 142:7-9).  This leaves "NewCategory" (the name Mr. Bruner used for the parameter that established the term length of the insurance policy sought) and "ModeUsed" (to identify whether the premium would be paid on a monthly, quarterly, semi-annually, or annual basis) as the only protectable variable names that  Defendants copied.

In sum, Defendants have met their burden of establishing that a significant portion of Compulife's source code does not constitute protectable expression.  Since much of Compulife's source code has been filtered out, only a small portion of Compulife's source code is protectable and subject to an evaluation of substantial similarity.

c.   Substantial Similarity

In its remand decision, the Eleventh Circuit found that "Compulife provided at least some evidence of both quantitative and qualitative significance" and that while "[q]ualitative significance is often apparent on the face of the copied portion of a copyrighted work," Compulife went a step further by introducing

> extrinsic evidence of the qualitative significance of some copied elements. Chris Bruner testified that part of the code copied by the defendants includes variable names and parameters that must be formatted exactly for the web quoter to communicate with the Transformative Database at all. At a minimum, this testimony is some evidence of the qualitative significance of the copied portion of Compulife's work.

*Compulife Software Inc.*, 959 F.3d at 1310.

With regard to quantitative significance, the Eleventh Circuit found that the similarities between the texts of the two codes to be "apparent on their faces" and that

> [e]ven a cursory comparison . . . suggests that the defendants' work copied material from nearly every page of the copyrighted work. The defendants' code includes nine of the eleven basic sections of Compulife's code, arranged in almost exactly the same order.

*Id.*

I agree that a cursory comparison suggests that Defendants copied a quantitatively significant portion of Compulife's source code.  Nevertheless, as discussed above, I have determined that most of the material Defendants copied was unprotectable.  According to Compulife, its HTML source code totals 347 lines (Vol. 3, 147:4), and Defendants copied 282 of those lines. (Vol. 3, 144:7-146:22).  I find that, at most, the protectable portions of Compulife's code that Defendants copied are limited to 27 lines, namely lines 507, 508, 761, 764-788.  (PX 149).  Even so, as discussed below, Compulife failed to establish that lines 764-788 of Defendants' code are substantially similar to its copyrighted code.  Thus, quantitatively, Defendants' copying was insignificant.  *See, e.g., Google LLC v. Oracle Am., Inc.,* 141 S. Ct. at 1205 (out of several million lines in Oracle's Sun Java API computer code,  Google copied roughly 11,500 lines to create its Android platform (0.4%); the Supreme Court focused on the "several million lines that Google did not copy" and noted that with regard to the lines Google did copy, it was not "because of their creativity [or] their beauty").

I further find a lack of qualitative significance in the protectable portions of the code that Defendants copied.  "The qualitative component concerns the importance of the portion taken to the value of the original work . . ."  *Lagassey v. Roy*, No. 14-14303-CIV, 2017 WL 1397410, at *4 (S.D. Fla. Jan. 31, 2017) (J. Marra).  The Eleventh Circuit found that because the variable names and parameters "must be formatted exactly for the web quoter to communicate with the

Transformative Database," this established at least "some evidence of the qualitative significance" of the Compulife code that Defendants copied.  Even so, as discussed above, the formatting of most of the names and variables was based on common sense and logic and did not involve any original or creative expression.  Thus, the need for the formatting to be "exact" does not transform the code into something protectable.  Once this part of the code is filtered out, I find the qualitative significance of what remains to be lacking and insufficient to support a finding of infringement. First, there are differences between Compulife's protected lines of code and the comparable code used by NAAIP.  For example, in "NewCategory" NAAIP assigns different values and names to each type of term policy that are different from those assigned in Compulife's code.  *Compare* PX 149 at lines 759-788 *with* PX 542 at 7-8.  Moreover, NAAIP's code reveals that it did not use Compulife's "ModeUsed" variable because it is undefined.  *See* PX 149 at line 507.

Compulife has the burden at this stage of the analysis and I find that Compulife failed to identify "distinctive features" or elements of its code that "make the program especially creative or desirable."  *Compulife Software Inc.,* 959 F.3d at 1302.  Without an adequate showing of the qualitative significance of the minimal lines of code Defendants copied that are protectable, Compulife has failed to meet its burden and its copyright infringement claims (Counts I and II in the '08 case, and Counts II and III in the '42 case) must fail.

III. Misappropriation of Trade Secrets

Compulife claims that Defendants violated the Federal Defend Trade Secrets Act ("DTSA") and the Florida Uniform Trade Secrets Act ("FUTSA") in both the '08 and '42 cases.

In order for Compulife to prevail on its claim for misappropriation of trade secrets, it must demonstrate that (1) it possessed a trade secret;[26] and (2) its trade secret information was

---

[26]  "The DTSA and FUTSA similarly define[ ] a 'trade secret' as (1) any type of information, (2) that derives economic value from being secret, and (3) that is kept secret."  *Id.* "'Information that

"misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it." *Del Monte Fresh Produce Co. v. Dole Food Co.*, 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001). As noted above, the determination that Compulife's Transformative Database is a trade secret is law of the case. Therefore, my analysis is limited to whether Compulife has proven that Defendants misappropriated it.

A trade secret can be misappropriated by either acquisition, disclosure, or use. *See* Fla. Stat. § 688.002(2). Compulife alleges Defendants misappropriated its trade secret by acquisition and by use. A person misappropriates a trade secret by acquisition when he acquires it and "knows or has reason to know that the trade secret was acquired by improper means." § 688.002(2)(a). A person misappropriates a secret by use if he uses it "without express or implied consent" and either:

1. Used improper means to acquire knowledge of the trade secret; or

2. At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:

    a. Derived from or through a person who had utilized improper means to acquire it;

    b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

    c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

3. Before a material change of her or his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*Id.* § 688.002(2)(b).

---

is generally known or readily accessible to third parties cannot qualify for trade secret protection.'" *Primo Broodstock, Inc. v. Am. Mariculture, Inc.*, No. 2:17-CV-9-FTM-29CM, 2017 WL 1502714, at *11 (M.D. Fla. Apr. 27, 2017) (quoting *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998)). Both the DTSA and FUTSA provide that compilations may constitute trade secrets. *See* 18 U.S.C. § 1839(3); Fla. Stat. § 688.002(4).

The Florida Statute states that "improper means" for acquiring a trade secret include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." § 688.002(1). Even if measures taken by the trade-secret owner to protect the secret prove to be inadequate, that alone will not render a means of acquisition proper. *Compulife Software Inc.,* 959 F.3d at 1312. "So long as the precautions taken were reasonable, it doesn't matter that the defendant found a way to circumvent them." *Id.* "[M]isappropriation occurs whenever a defendant acquires the secret from its owner 'without his permission at a time when he is taking reasonable precautions to maintain its secrecy.'" *Id.* (quoting *E. I. duPont deNemours & Co. v. Christopher*, 431 F.2d 1012, 1015 (5th Cir. 1970)).

As for what constitutes misappropriation-by-use, the Eleventh Circuit has noted that the bar is "generally low" in that "any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use.'" *Compulife Software Inc.,* 959 F.3d at 1313 (quoting *Penalty Kick Mgmt. v. Coca Cola Co*., 318 F.3d 1284, 1292 (11th Cir. 2003)).

### a. Misappropriation in the '08 Case

In its remand order, the Eleventh Circuit observed that in the '08 case, Defendants "plausibly engaged in 'misrepresentation'—and thus 'improper means' . . . given the way that David Rutstein explained the defendants' affiliation with McSweeney and Savage to Compulife's Jeremiah Kuhn when Rutstein initially sought access to the Transformative Database." *Compulife Software Inc.,* 959 F.3d at 1313. Having observed the testimony of the relevant witnesses, I find that David Rutstein unquestionably misrepresented his affiliation and that this is sufficient to establish Defendants' misappropriation of Compulife's trade secret.

The testimony and exhibits establish that on August 17, 2011, David Rutstein emailed Brian McSweeney and service@compulife.com, with the subject line "Dear Compulife – I have an account with you through Eric Savage."  (DX 1).  The email requested assistance from Compulife to put a quote engine on www.BeyondQuotes.com.  The email said, "I also work with Brian McSweeney of www.BMlifequotes.com."  (DX 1; Vol. 4, 181:17-20).  Mr. Kuhn testified that he received the email and believed that David Rutstein was a website designer for Eric Savage and Brian McSweeney, both of whom were Compulife customers.  (Vol. 3, 75:14-25, 76:13-16). I reject Mr. Rutstein's testimony that his email "said [BeyondQuotes.com] is my website" (Vol. 4, 181:19); the email says no such thing.[27]  Moreover, Mr. Kuhn testified that Mr. Rutstein's email led him to believe that BeyondQuotes.com was owned by Mr. McSweeney or Mr. Savage.  (Vol. 3, 79:7-13).  I fully credit Mr. Kuhn's testimony and I find his understanding of the situation to be reasonable.   Moreover, I find Mr. Kuhn's mistaken beliefs to be the direct and intended consequence of Mr. Rutstein's misrepresentation.

Upon receiving Mr. Rutstein's email, Mr. Kuhn provided the Compulife HTML quoter code to him. (Vol. 3, 81:7-11, 106:24-107:6, DX 4). However, Mr. Kuhn testified that had he known that Mr. Rutstein intended to use the Compulife HTML quoter code on BeyondQuotes.com and NAAIP.org without paying a licensing fee, Mr. Kuhn never would have given him the Compulife HTML code.  (Vol. 3, 107:23-108:7).  I credit this testimony and reject Defendants' assertion that "David Rutstein was freely given access to Compulife's database" because "Compulife, itself, provided David Rutstein with a website quoter and link to its [ ] database." ECF No. 306 at 30-31.  I find that David Rutstein intentionally misled Compulife in August 2011, which directly resulted in his acquisition of Compulife's Transformative Database without

---

[27]  This is just one example of why I found that overall, David Rutstein was not a credible witness.

Compulife's permission.[28]   Furthermore, the testimony reveals that this unlawful acquisition occurred at a time when Compulife was taking reasonable precautions to maintain the secrecy of the Transformative Database, through the use of licensing agreements, which amounts to misappropriation.   Therefore, in the '08 case, Compulife is entitled to judgment in its favor on Counts IV and V.

        b.   <u>Misappropriation in the '42 Case</u>

In the '42 case, Compulife contends that Defendants engaged in misappropriation-by-use when they conducted a scraping attack of Compulife's Term4Sale website during the first four days of September 2016.  Having observed Moses Newman as a witness during the trial, I find his testimony to be credible.

Mr. Newman, a computer programmer who worked for NAAIP.org in 2016, testified that at David Rutstein and Aaron Levy's direction, he watched an Israeli woman named Matal use a computer to send automated requests in a way that was consistent with scraping.  (Vol. 4, 109:19-110:6; Vol. 5, 67:22-68:3).  Mr. Newman testified that the information Matal scraped came from Compulife.  (Vol. 4, 114:5-9).  Matal took the information from the scraping attack and put it in a large CSV file, which Mr. Newman then integrated into the database that provided quote information to NAAIP.org websites. (Vol. 4, 110:7-18).

Mr. Bruner and Ms. Miracle testified that the scraping attack originated from a single internet protocol (IP) address (which Mr. Bruner traced to a computer or server in Jerusalem, Israel), and it sent over 800,000 requests to the Term4Sale server over a four-day period; each

---

[28]   Defendants' subsequent acquisition of the Transformative Database from MSCC was likewise achieved through improper means, in that David Rutstein directed Brian McSweeney (an MSCC account holder) to put BeyondQuotes.com on MSCC's server.  McSweeney accomplished this by deceiving Mr. Steinhart into believing that he owned BeyondQuotes.com.

request used the parameters in Compulife's HTML code while incrementing the corresponding variables one at a time, thus scraping the Compulife database. (Vol. 2, 134:1-4, 135:10-24; Vol. 3, 19:25-20:13; PX 200). Mr. Newman corroborated Mr. Bruner's testimony that the attack sought information for two zip codes, one in New York and the other in Florida. (Vol. 2, 160:8-21; Vol. 4, 113:2-6). Mr. Bruner compared the quotes that NAAIP produced after the scraping attack and they matched the quote information obtainable at Compulife's Term4Sale website. (Vol. 2, 172:7-12, PX 568 at 36-40). Ms. Miracle also examined the quotes NAAIP produced and found Compulife's digital watermarks in the quotes. (Vol. 4, 8:23-10:14). She also discovered that Defendants have a database on the NAAIP server that contains quote information with specific fields that match Compulife's parameters and zip codes that correspond to the two zip codes scraped in the attack on the Term4Sale website. (Vol. 4, 25:25-26:23).

Although the individual quotes themselves are not entitled to protection as trade secrets because they are publicly available, I find that so much of the Transformative Database was taken during the scraping attack that it amounted to a protected portion of Compulife's trade secret. Indeed, Ms. Miracle estimated that the scraping attack produced 43.5 million results. (Vol. 4, 9:12). The volume of Compulife's data that Defendants acquired during the scraping attack constituted such a significant compilation of information that "[d]erives independent economic value . . . from . . . not being readily ascertainable" as to warrant trade secret protection. *See Compulife Software Inc.,* 959 F.3d at 1314-15 ("Even if quotes aren't trade secrets, taking enough of them must amount to misappropriation of the underlying secret at some point. Otherwise, there would be no substance to trade-secret protections for 'compilations,' which the law clearly provides.") (citing Fla. Stat. § 688.002(1), (4)); *Penalty Kick Mgmt.,* 318 F.3d at 1292–1293

("[U]se of any substantial portion of the secret is sufficient to subject the actor to liability" for misappropriation of trade secret.).

As the Eleventh Circuit noted, "[a]lthough Compulife has plainly given the world implicit permission to access as many quotes as is *humanly* possible, a robot can collect more quotes than any human practicably could. So, while manually accessing quotes from Compulife's database is unlikely ever to constitute improper means, using a bot to collect an otherwise infeasible amount of data may well be . . . ." *Compulife Software Inc.,* 959 F.3d at 1314 (citing *Christopher*, 431 F.2d at 1013). In its analysis, the Eleventh Circuit relied on "the most closely analogous case of which we are aware," namely, *Physicians Interactive v. Lathian Sys., Inc*., No. CA 03-1193-A, 2003 WL 23018270, at *8 (E.D. Va. Dec. 5, 2003). There, the district court stated, "There can be no doubt that the use of a computer software robot to hack into a computer system and to take or copy proprietary information is an improper means to obtain a trade secret, and thus is misappropriation under the VUTSA," which the Eleventh Circuit found to be "sufficiently similar" to the FUTSA. *Compulife Software Inc.,* 959 F.3d at 1314-15. Moreover, the Eleventh Circuit agreed with the Virginia court's finding that "the trade-secret owner's 'failure to place a usage restriction on its website' did not automatically render the hacking proper," stating, "So too, here." *Id.* (quoting *Physicians Interactive,* 2003 WL 23018270, at *7). Given the foregoing, I reject Defendants' argument that Compulife cannot establish misappropriation due to its failure to restrict use at Term4Sale.com prior to the scraping attack.

Based on the circumstances here, including evidence in the record of David Rutstein's persistent efforts to sabotage Compulife by luring away its customers, I find that by using a robot to hack the Term4Sale website, Defendants intentionally sought to acquire Compulife's trade secrets through improper means. Defendants' subsequent use of the Term4Sale website in a way

that was never intended, stealing a significant portion of Compulife's data, and knowingly incorporating that stolen data into its own websites also constitutes improper means. Thus, in the '42 case, Defendants are liable for misappropriation of Compulife's trade secrets through both acquisition and use and Compulife is entitled to judgment on Counts I and V.

VI.   <u>Joint and Several Liability</u>

"Joint and several liability was established through the common law and later codified by the legislature [to] allow[] a claimant to recover all damages from one of multiple defendants even though that particular defendant may be the least responsible defendant in the cause." *Agency for Health Care Admin. v. Associated Indus. of Fla., Inc.*, 678 So. 2d 1239, 1257 (Fla. 1996).

Florida is a comparative fault state, meaning that "[i]n a negligence action, the court shall enter judgment against each party liable on the basis of such party's percentage of fault and not on the basis of the doctrine of joint and several liability." *Martinez v. Miami-Dade Cty.*, 975 F. Supp. 2d 1293, 1296 (S.D. Fla. 2013) (citing Fla. Stat. § 768.81(3)).  Nevertheless, Florida's comparative fault statute specifically excludes "any action based upon an intentional tort."  Fla. Stat. § 768.81(4).  "Misappropriation of trade secrets is an intentional tort in the state of Florida." *Bovie Med. Corp. v. Livneh*, No. 8:10-CV-1527-T-24EAJ, 2010 WL 5297172, at *6 (M.D. Fla. Dec. 20, 2010) (citing *Vance v. Tire Eng'g and Distribution, LLC*, 32 So.3d 774, 776 (Fla. Dist. Ct. App. 2010)).  Thus, imposing joint and several liability against all of the Defendants named in these actions is proper.  *See Hennis v. City Tropics Bistro, Inc.*, 1 So. 3d 1152, 1154–55 (Fla. Dist. Ct. App. 2009) ("The statutory language excluding actions 'based on an intentional tort' effectuated a public policy against permitting negligent tortfeasors to reduce their liability by shifting it to another tortfeasor whose intentional criminal conduct was a foreseeable result of the tortfeasor's negligence.") (citing § 768.81(4)).

Here, the evidence established that all four Defendants were involved in either directly acquiring Compulife's trade secrets or in using these trade secrets for economic gain and/or to the detriment of Compulife.   David Rutstein was heavily involved in acquiring Compulife's Transformative Database through misrepresentation and deceit.  Mr. Levy and Mr. Moses were directly involved in the scraping attack.   And Binyomin Rutstein owned AWD, a licensed insurance agency, which he allowed his father to use to collect fees from insurance sales leads generated by Compulife's stolen Transformative Database.   Binyomin allowed his father to use his insurance license and name to establish insurance-related businesses in violation of the consent decree barring him from the insurance industry.   Each Defendant played a critical role in the enterprise to misappropriate Compulife's trade secrets, and therefore, joint and several liability is appropriate.

## VII. Damages

FUTSA provides that damages for misappropriation of trade secrets "can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss . . . . If willful and malicious misappropriation exists, the court may award exemplary damages in any amount not exceeding twice any award made . . . ."  Fla. Stat. § 688.004.[29]   The burden of proof on damages in trade secret cases has been described as "liberal" in that "when some damage is proven and the 'uncertainty lies only in the amount of damages, recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or approximated.'"  *Premier Lab Supply, Inc. v. Chemplex Indus., Inc.*, 94 So. 3d 640, 644 (Fla. Dist. Ct. App. 2012) (quoting *Perdue Farms, Inc. v. Hook*, 777 So. 2d 1047,

---

[29]  In addition, if a court finds that "willful and malicious misappropriation exists, [it] may award reasonable attorney's fees to the prevailing party." Fla. Stat. § 688.005.

1051 (Fla. Dist. Ct. App. 2001)); *see also Advantor Sys. Corp. v. DRS Tech. Servs., Inc*., 678 F.

App'x 839, 857 (11th Cir. 2017).

Here, I find that Compulife is entitled to recover the unjust enrichment Defendants received

as a direct result of misappropriating Compulife's trade secrets.  Specifically, Compulife is entitled

to the $75,819.00 that Mr. McSweeney paid to AWD for sales leads he received from

BeyondQuotes.com while Compulife's software and data were used on the website.  Likewise,

Compulife is entitled to recover the $108,406.87 that One Resource Group paid to AWD in

commissions from sales of insurance policies by NAAIP.org members during the period of time

that NAAIP used Compulife's software and data.

I further find that Compulife has established that Defendants acted willfully and

maliciously in misappropriating Compulife's trade secrets.  For example, Compulife produced

evidence that after Defendants' access to Compulife's internet quote engine was terminated, David

Rutstein sent emails to Mr. Barney threatening to steal Compulife's customers.  David Rutstein

even attempted to carry out this threat by using Compulife's Term4Sale website to generate

hundreds of life insurance quotes, which he then used to send messages through the Term4Sale

website to Compulife's insurance agent customers stating: "Compulife quote engine: Beware of

security flaw. Your back office is not password protected," and providing a hyperlink to NAAIP

followed by the statement "term life quote engines are free."  This compelled Mr. Barney to

reassure his customers, some of whom thought that the contacts they normally would receive from

the Term4Sale website were being diverted somewhere else.  Based on this evidence, I find that

Compulife is entitled to exemplary damages under the FUTSA in an amount twice that of their

actual damages.  Moreover, given the collaborative efforts of all four Defendants, I find that each

of them is liable for misappropriating Compulife's trade secrets; thus, Defendants shall be jointly and severally liable for these damages.

I find that Compulife is entitled to injunctive relief based on Defendants' continued use of Compulife's data.  Even though the data stolen in the scraping attack is now nearly five years old, Mr. Barney testified that Defendants are still using that data to advertise their free life insurance quote engine, thus attracting potential Compulife customers, who would otherwise have to pay for that service.  Thus, Compulife is being irreparably injured and cannot be compensated for this loss by money damages because they are too speculative.  Accordingly, Defendant shall be enjoined from future use of Compulife's data.

Compulife's request for damages to compensate for the time Mr. Bruner spent investigating the scraping attack and implementing additional security measures is denied.  I find that these activities are within the scope of Mr. Bruner's employment and that Compulife did not incur additional costs for these services.

Finally, Compulife's request for damages representing their alleged lost licensing fees are denied.  While I recognize that courts may be "liberal" with damages awarded to victims of trade-secret misappropriation, I find that the evidence regarding Compulife's lost licensing fees is too speculative to justify an award.  There is simply no basis to assume that every user of the NAAIP website would have paid an annual licensing fee to Compulife, had NAAIP never existed. Moreover, Mr. Barney acknowledged that the influx of legitimate competitors into the marketplace during the last five years may have contributed to Compulife's decline in revenue.  The absence of "proof of a reasonable basis" from which Compulife's lost licensing fees "can be inferred or approximated" (*Premier Lab Supply, Inc.*, 94 So. 3d at 644), necessitates the denial of these damages.

## CONCLUSION

Based on the foregoing, Compulife is entitled to judgment in its favor on its claims for misappropriation of trade secrets (Counts IV and V in the '08 case and Counts I and V in the '42 case). Defendants shall be jointly and severally liable for damages in the amount of $368,451.71, plus prejudgment interest. Judgment shall be entered in favor of Defendants on the copyright infringement claims (Counts I and II in the '08 case and Counts II and III in the '42 case).

Plaintiff's counsel shall submit a proposed final judgment, including proposed provisions for the permanent injunction, within one week of this order.

**DONE and ORDERED** in Chambers this 12th day of July, 2021, at West Palm Beach in the Southern District of Florida.

_____

BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE